# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Otis Mays,

        Plaintiff,

v.

Sherburne County Jail, et al.,

        Defendants.

Case No. 20-cv-506 (PAM/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on (1) Defendants' Motion for Summary Judgment and Judgment on the Pleadings (Dkt. 110) ("Motion for Summary Judgment"); (2) pro se Plaintiff Otis Mays' "Request to Preserve Jail Recordings, Video Footage & or Turn Over the Requested Video Footage" (Dkt. 134) and "Request to Preserve Jail Recordings, Video Footage & Turn Over the Requested Video Footage" (Dkt. 138) (collectively, "Requests to Preserve Recordings"); and (3) pro se Plaintiff Otis Mays' Motion for Hearing on Lack of Medical Care in Marshals Custody (Dkt. 137) ("Motion for Hearing"). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Defendants' Motion for Summary Judgment be granted and Plaintiff's Requests to Preserve Recordings and Motion for Hearing be denied.

# I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On February 13, 2020, pro se Plaintiff Otis Mays' ("Plaintiff" or "Mays") filed a Complaint under 42 U.S.C § 1983 and attached a "Defendants List Master," listing twenty-seven Defendants sued in their individual and official capacities, including "Zack," "Ms. Sherry K.," "Patton," "Lumply," "Lori," "Rachael Clem," "Kholar Joshua," "Andrea," "Jess," "Sean," "Ashley G," "Bryan Bjergo," "Brian McDonough," "Tyrel Hoppe," "Aric Hanson," "Bond," "Travis Lundstrom," "Heather Picket," "Demar," "Kolbinger," "Christopher Bloom," "Thomas Zerwas," "Brian Frank," "Dave Isais," "Pat Carr," "Mike Siege," and "Janail Hassian," as well as Sherburne County Jail. (Dkt. 1 at 1, 5.)[1] All Defendants, except Janail Hassian, are officials and employees of the Sherburne County Jail ("the Jail"). Mays sued Defendants for events that occurred while he was housed as a pretrial detainee at the Jail from March 13, 2019 to March 9, 2020, and made the following allegations[2]:

> 1. "Defendants Janiel [H]ussain, C.O. Adam Walkey, SGT. Travis [L]undstrom, Sgt. Demar, SGT. Bryan & Bjergo, Commander Patt Carr, Jail Admin Brain Franks, Captain Bloom and Captain Zerwas," violated his First, Fifth, Eighth, and Fourteenth Amendment rights, as well as committed the state law tort of negligence, by "allowing other inmates medical eye glasses but denying [him one]." Mays claims that he was "given a memo by the clinic" stating that "[t]inted eye glasses are not

---

[1]     All page number citations are to the CM/ECF pagination unless otherwise noted.

[2]     In his answer to the question, "which Federal Constitutional, statutory or treaty right is at issue? List all that apply," Mays lists the 1st, 6th, 8th, and 14th Amendments, but does not, however, provide any factual allegations in support of a 6th Amendment claim, nor does he specifically reference the 6th Amendment in his statement of facts. Accordingly, the Court understands that Mays is not pursuing a 6th Amendment claim against any of the Defendants, and therefore, does not address the 6th Amendment in this Report and Recommendation.

allowed in the facility due to the safety & security," but that "this is not true because [he has] seen multiple inmates with tinted eye glasses" ("Claim 1");

2. Defendant "CO Kholar Joshua"[3] violated his First, Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, by placing him at a substantial risk of serious harm and harassment from other inmates and jail staff by stating in the presence of other inmates that Plaintiff "needed to quit telling on people" and by retaliating against Mays after Mays filed a "kite/grievance" for CO Joshua's comment, resulting in Mays being assaulted by an inmate on July 31, 2019 and causing him physical and mental injuries ("Claim 2");

3. "Defendants Sherburne [C]ounty [J]ail, Commander [P]at [C]arr, Captain Thomas Zerwas, SGT. Lundstrom[4], SGT. Lisa, SGT. Bartell, SGT. Bond, SGT. McDonnah, Co. Zack, Co. Sherry K, Co. Patton, Co. Lumply, Co. Lori, Co. Drew Howt, Co. Sean, Co. Paul, Co. Tom Bergron, Co. Rachael Clem, Co. Kholar Joshua, Co. Ashley G, & Co. Simon" violated his Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, by subjecting him to "cruel & inhumane conditions of confinement related to the unnecessary exposure & health risk" as he was "forced to eat[,] sleep & live in a cell for more than 50 plus hours with a toilet that was filled with another inmates [sic] human waste" and that he made several requests to the Defendants to allow him "to eat outside of [his] cell, to be moved to another cell to relieve [himself] & to have [his] toilet repaired as soon as possible" but to no avail, leading him to contracting "a rash on [his] butt as well as hemorrhoids" ("Claim 3");

4. "Defendants CO. Jess, CO Adrian Johnson, SGT. Kolbinger, CO. Paul" violated his First, Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, due to them retaliating against him for writing a grievance against CO Jess on January 22, 2020 and

---

[3] At times, Mays refers to "Kohlar Joshua" or similarly indicates this Defendant's name is Kohlar Joshua in the Complaint. (*E.g.*, Dkt. 1 at 6 ¶ 2.) Defendants refer to this Defendant as "Kholar." (*E.g.*, Dkt. 112 at 23.) However, it appears the correct name is "Joshua Kolar" (*see* Dkt. 115 (Declaration of "Joshua Kolar")), and the Court refers to him in this manner.

[4] Smith lists this Defendant as "Lundstrom" in his Master List (*see* Dkt. 1 at 5), but sometimes refers to him as "Lunstrom" (*see id.* at 7 ¶ 5). Defendants refer to this Defendant as "Lunstrom" (*See* Dkt. 112 at 13, 26, 33), and the Court also refers to him in this manner.

because these Defendants were present when CO Jess retaliated against him but failed to intervene ("Claim 4");

5. "Defendants CO. Lumply [and] Sgt. Travis Lustrom" violated his First, Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, because CO Lumply "verbally made a sexual statement to [him] and threaten[ed him]" on January 21, 2020 while knowing that Mays had been "sexually abused" by "inmate J.B." the week before. Mays states that he believes CO Lumply made these statement "due to [Mays] filing a grievance a week before on his Sgt. For his part in [Mays'] sexual abuse" ("Claim 5");

6. "Def[e]ndants (CO) Rachel Clem [and] SGT. Hoppe" violated his First, Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, because on approximately December 31, 2019, CO Clem "told a group of inmates [Mays] had snitched on another inmate" and after reporting CO Clem's actions to Sergeant Hoppe, CO Clem made a threatening statement to him, leading to him being "harassed by a number of inmates and [he has] been dealing with lot's [sic] of mental & emotional pain since that incident" ("Claim 6");

7. "Defendants SGT. Heather Picket, SGT. Bartell, Sgt. Mccdona, SGT. Hoppe, CO. Lumply, CO. Lizzy, Co. Patton, CO. Kholar, CO, Ms.K, CO. Racheal Clem, CO. Zack, Co. Lori" violated his Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, by "creating a substantial risk to [his] mental health" because CO Kholar, CO Lizzy, and "2 other unknown (CO[s])" placed him in a cell from "Dec[ember] 27th 2019 through January 7th 2019"[5] that was across inmate J.B.'s cell, who was known to have previously assaulted Mays, resulting in him suffering "[n]ightmares, [a]nxiety, [d]epression, [s]erve [sic] headaches & [e]tc" ("Claim 7");

8. "Defendant[s] SGT Bartell, SGT. Mccdona, CO. Lumply, Co. Patton, CO. Kholar, CO, Ms.K, Co. Thompson, Co. Rachael Clem, Co. Zack, [and] Co. Lori" violated his Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, by denying him medical care because while he was directed to undergo a foot soak treatment "from November of 2019 until December of 2019," Defendants

---

[5]    The Court assumes that Mays' reference to "January 7, 2019" is a typo and that he intended to state "January 7, 2020" given that Mays was not in the Jail as of January 7, 2019. (*See* Dkt. 119 ¶ 1 (Declaration of Thomas Zerwas, Captain of the Jail, stating that Mays was detained at the Jail from "March 13, 2019, to March 9, 2020.").) The Court proceeds under this assumption.

CO. Lumply, Co. Patton, CO. Kholar, CO, Ms.K, Co. Thompson, Co. Rachael Clem, Co. Zack, Co. Lori "& others" failed to refill the bucket he for used the treatment with water, causing him to develop an infection and "other health issues" ("Claim 8"); and

9. "Defendant SGT. Unknown" violated his First, Fifth, Eighth, and Fourteenth Amendment rights, and committed the state law tort of negligence, "by not giving [him] a hearing by the wolf standards" during a jail disciplinary hearing for events that occurred on October 15, 2019, given that his requests to be represented by a staff and to have two witnesses testify were not upheld ("Claim 9").

(*Id.* at 6-10 ¶¶ 1-9.)

On the same day he initiated this case, Mays also filed an Application to Proceed in District Court Without Prepaying Fees or Costs ("IFP Application"), as well as an "Affidavit" of Edwin Martinez (who was allegedly also an inmate at the Jail) wherein he attests that he "currently [has] tinted glasses that were approve[d] by the medical provider." (Dkt. 2; Dkt. 3. at 1.)

On March 23, 2020, then-U.S. Magistrate Judge Katherine M. Menendez[6] issued an order on the IFP Application and warned Mays that:

[I]t is not obvious from the complaint that "any question of law or fact common to all defendants will arise" in this litigation. *See* Fed. R. Civ. P. 20(b)(2)(B). The complaint concerns several instances in which Mr. Mays believes that his constitutional rights were violated while incarcerated; these events, however, appear to be unrelated to one another. If so, this action may have to be severed into separate lawsuits, with Mr. Mays responsible for the filing fee in each lawsuit. *See George v. Smith*, 507 F.3d 605, 607-08 (7th Cir. 2007). Mr. Mays should therefore consider carefully whether to limit the scope of this litigation to only one set of claims and defendants.

---

[6] This case was reassigned from then-Magistrate Judge Menendez to the undersigned when Judge Menendez was elevated to the District Court bench in December 2021. (*See* Dkt. 125 (Dec. 22, 2021).)

(Dkt. 6 at 3 n.2.)

Following approval of the IFP Application, in April 2020, the Clerk's Office sent Mays U.S. Marshals Service Forms ("USM 285 service forms") for each Defendant in the manner listed in the Complaint that were to be completed by Mays in order for service to be effectuated in this case. (Dkts. 10, 12-14.) On May 7, 2020, the Clerk's Office received a letter from Mays, seeking assistance with completing the USM 285 service forms, stating that he never received USM 285 service forms for certain individuals, and requesting service forms for those individuals.[7] (Dkt. 15 at 1-4.) On May 11, 2020, Judge Menendez issued an Order reminding Mays of his responsibility to complete "these forms so that the United States Marshal can effect service on the defendants" because "[w]ithout service, the case cannot proceed." (Dkt. 16 at 1.) That Order included a URL link to the District of Minnesota's website's information sheet for individuals that have been granted IFP status, stating that "[a plaintiff] must provide the Clerk's Office with an accurate address for each named defendant on a U.S. Marshal Service form to ensure that each defendant is properly served." (*Id.* (citing https://www.mnd.uscourts.gov/sites/mnd/files/InfoSheet3-IFP.pdf).) Regarding Mays' request for additional USM 285 service forms, the order stated that "only two [of the individuals Mays sought the service forms for] appear to have been identified as

---

[7]    In the letter, Mays contends that he did not receive USM-285 service forms for the following individuals: "Sgt. McDonnah, Sgt. Bartell, CO Drew Howt, CO Simions, CO Tom Berson, CO Adrian Johnson, CO Linzy, CO Lumply, CO Patton, CO Adam Walkley, CO Paul, as well as John Doe 1-5, Jane Doe 1-5." (*See* Dkt. 15 at 1; *see also* Dkt. 16 at 1.)

defendants in [his] Complaint: Sergeant Brian McDonough and CO Lumply," and as a result, the Clerk's Office was directed to re-send the service forms for only Sergeant Brian McDonough and CO Lumply.  (*Id*.)

On July 7, 2020, the U.S. Marshals Service filed a single-page process receipt and return indicating service of unspecified summons or summonses on "Defendant Sherburne County Jail et al," on May 13, 2020 at "Sherburne County Government Center, Attn. Auditor/Treasurer," and on June 2, 2020, counsel filed an Answer for Defendants as listed in the Complaint, with the exception of "Andrea" and "Janail Hassian."  (Dkts. 17, 31.)  On May 29, 2020, the Clerk's Office received a letter from Mays, wherein he requested several forms of relief, including that his mail be sealed due to fear that staff at the Federal Correctional Institution-Gilmer ("FCI-Gilmer"), where he was then incarcerated, were reading his mail, and requesting an order requiring preservation of certain items, including grievances, kites, medical requests, notes, camera footage, and recordings and notes from disciplinary proceedings.  (Dkt. 20 at 1-3.)  On June 15, 2020, the Court received another letter from Mays seeking an emergency order to allow him to depose several non-party inmates who he asserted had information relevant to this case and for the Jail to send his property, including documents, grievances, kites, notes, and other items that would have helped him file his complaint, to him at FCI-Gilmer.  (Dkt. 22 at 1-5.)  On June 15, 2020, Judge Menendez ordered Defendants to respond to Mays' letters, and upon receiving Defendants' response, issued an order denying the various requests contained in Mays' letters on July 23, 2020.  (Dkts. 23, 27, 39.)  A Scheduling Order setting various deadlines in this case was entered on

July 23, 2020, including setting the deadline for discovery as March 1, 2021 and the deadline for nondispositive motions as March 22, 2021. (Dkt. 38 at 1-3.)

On June 19, 2020 and July 6, 2020, the Clerk's Office received letters from Mays, wherein he stated his intent to amend the Complaint in order to include additional details and to drop one claim. (Dkt. 25 at 1; Dkt. 28) Mays then filed a 73-page amended complaint on July 6, 2020, which sought to add a substantial number of new allegations and claims against several individuals, including Defendants and other non-parties. (Dkt. 30.) On July 23, 2020, Judge Menendez denied Mays' attempt to amend his complaint due to procedural deficiencies, noting that the amended complaint "is not the operative pleading in this case. Instead, the original Complaint remains the operative pleading" and found the proposed amended complaint was also substantively problematic because "it did not solve the problem of combining unrelated claims that the Court pointed out in its March 23rd Order. In fact, it makes the problem worse." (Dkt. 39 at 2-5.) The parties were ordered to file supplemental briefs "regarding whether the claims in the original Complaint can reasonably remain part of the same lawsuit or if they should be severed into separate suits." (*Id.* at 5-6.) Defendants filed their supplemental brief regarding severance on August 6, 2020, asking that the claims not be severed, and on August 13, 2020, an Order stating the claims would proceed in a single proceeding issued. (Dkts. 40, 43.)

On November 5, 2020, the Clerk's Office received a letter from Mays. (Dkt. 48.) Mays acknowledged in that letter that the Scheduling Order set the deadline to amend pleadings as October 19, 2020, but nonetheless, sought among others, an extension of

time to file an amended complaint to "add new and amended claims, parties and other things." (*Id.* at 1.) Mays' extension request was denied on November 10, 2020 due to his failure to show good cause for leave to amend. (Dkt. 50 at 1-2.) Mays thereafter filed multiple papers, seeking in part, to modify the Scheduling Order in order to increase the number of interrogatories allowed by each party, to be permitted to take the depositions of various individuals, and to amend his complaint and to add defendants to this suit (*see e.g.* Dkts. 54-57, 64-66, 69, 75, 79, 87); Defendants objected to Mays' requests and disputed the need for additional discovery (Dkt. 53, 67, 73). On August 6, 2021, Judge Menendez issued an Order permitting an additional 25 interrogatories, and denied Mays' request for depositions and to amend the complaint, as well as his various discovery requests. (Dkt. 88 at 1-12.) That Order also amended the Scheduling Order, setting the deadline for Mays to serve the additional interrogatories as September 13, 2021, as well as setting the deadline for filing and serving nondispositive motions relating to discovery as November 3, 2021, and the deadline for dispositive motions as December 17, 2021. (*Id.* at 12-13.)

Mays filed a motion for a temporary restraining order on September 23, 2021. (Dkt. 94.) On September 30, 2021, Judge Menendez recommended denial of that motion, and on October 27, 2021, U.S. District Judge Paul A. Magnuson adopted her recommendation. (Dkts. 99, 102.) Mays filed another motion for emergency temporary restraining order on October 20, 2021 ("October 20 TRO Motion"). (Dkt. 100.) On October 29, 2021, Judge Menendez recommended denial of the October 20 TRO Motion ("October 29 R&R"). (Dkt. 103.) Mays sought reconsideration of the October 29 R&R

on November 15, 2021 ("Reconsideration Motion") (Dkt. 106) and also filed a motion for emergency hearing on November 3, 2021 (Dkt. 104), as well as a motion to amend the October 20 TRO Motion on November 15, 2021 (Dkt. 107).  On December 3, 2021, Judge Menendez denied the Reconsideration Motion, denied Mays' motion for emergency hearing, and also denied his request to amend the October 20 TRO Motion. (Dkt. 109.)  On January 19, 2022, Judge Magnuson adopted the October 29 R&R.  (Dkt. 129).

Defendants filed the Motion for Summary Judgment along with a supporting memorandum and several declarations on December 16, 2021 (Dkts. 110, 112-119), which are discussed in detail in Section II.A. below.

On December 28, 2021, Mays filed a Request for Admissions to the Defendant (Dkt. 126), Request for Production of Documents to Defendant (Dkt. 127), and a letter to Judge Menendez.  (Dkt. 128.)  Mays made several assertions in that letter, including that he was informed by a sergeant at the Jail that Defendants' counsel had made a request for Mays to cease contact with her and her firm and that Defendants were "continuing to tamper with [his] legal mail."  (Dkt. 128 at 1-2.)  Mays also stated in the letter that he was forced to miss deadlines because he had not been timely receiving his mail; asked the Court to order Defendants' counsel to respond to his interrogatories; and asked the Court to modify the Scheduling Order.  (*Id.*)  On January 21, 2021, the Clerk's Office received another letter from Mays, stating that he was informed that Defendants had filed the Motion for Summary Judgment on January 13, 2022, but he was still unable to contact Defendants' counsel due to the "no contact order," and requesting a copy of the Motion

10

for Summary Judgment so that he could respond. (Dkt. 130 at 1.) On January 25, 2022, the undersigned issued an Order directing the Clerk's Office to mail copies of Defendants' summary judgment papers (Dkts. 110 to 121) to Mays, re-set the deadlines for Mays' response and Defendants' reply, ordered the Defendants to state whether there was a "no contact order" in place at the Jail that prohibited Mays from contacting counsel, and stated that to the extent Mays sought modification of the Scheduling Order, he must file an appropriate motion by February 25, 2022. (Dkt. 131 at 2-3.) On January 31, 2022, Defendants' counsel confirmed that there was no applicable "no contact order" in place at the Jail restricting Plaintiff from contacting her and that she had not "found any evidence [suggesting] there was one." (Dkt. 132 at 1.) Mays filed a response to the Motion for Summary Judgment on February 3, 2022 ("SJ Response") (Dkt. 133) and Defendants filed a reply on February 17, 2022 ("SJ Reply") (Dkt. 136).

On February 3, 2022, Mays filed an initial Request to Preserve Recordings and a second, similar Request on February 18, 2022. (Dkts. 134, 138.) The Requests to Preserve Recordings are discussed in further detail in Section II.B below. Mays also filed the Motion for Hearing on February 17, 2022 (Dkt. 137), discussed in detail in Section II.C below.

On March 3, 2022, Mays sought an extension of time to file a sur-reply to Defendants' SJ Reply. (Dkt. 139.) The Court denied that request on March 7, 2022 because Local Rule 7.1 "does not afford any right to bring a sur-reply to a dispositive motion such as Defendants' Motion for Summary Judgment." (Dkt. 140 at 1-2; *see also* D. Minn. L.R. 7.1(c).) Mays nonetheless filed a sur-reply to Defendants' SJ Reply on

March 10, 2022, along with supporting documents. (Dkts. 141, 142.) The Court will not consider the sur-reply and supporting exhibits (Dkts. 141-142) because they are not permitted by Local Rule 7.1(c) and the Court previously denied Mays' request (Dkt. 140). *See Fredin v. Miller*, Civ. No. 18-cv-0466 (SRN/HB), 2018 WL 11282676, at *1 (D. Minn. April 10, 2018) (striking defendants' motions to dismiss for failure to comply with District of Minnesota Local Rule 7.1(c)). Moreover, Mays' proposed sur-reply and supporting exhibits would not change this Court's recommendation, as he essentially repeats the arguments in his SJ Response relating to his tinted eyeglasses claim and his exhibits largely correspond to those attached to the Declaration of Thomas Zerwas. (*Compare* Dkt. 141, *with* Dkts. 119, 119-1 to 119-4.) Finally, to the extent Mays claims he could not make certain arguments or provide certain evidence with his SJ Response because he could not access a notary (*see* Dkt. 141 at 1), he has not explained why a notary would be required for a declaration, affidavit, or "other evidence," *see* 28 U.S.C. § 1746 (permitting unsworn declarations made "under penalty of perjury").

On March 14, 2022, Defendants filed their responses to the Requests to Preserve Recordings and Motion for Hearing. (Dkts. 143-144.) On May 13, 2022, Mays sought an extension of time to reply to those responses because he had transferred to a different prison and did not receive the responses. (Dkt. 147.) The Court granted that request on May 17, 2022 and ordered Mays to file the replies by June 13, 2022. (Dkt. 149 at 3.) On June 3, 2022, Mays filed a reply to the Requests to Preserve Recordings and then filed a reply to the Motion for Hearing on June 21, 2022. (Dkts. 150-51.)

## II.    PENDING MOTIONS AND REQUESTS

### A.    Motion for Summary Judgment

On December 16, 2021, Defendants filed their Motion for Summary Judgment pursuant to Rules 12(c) and 56 of the Federal Rules of Civil Procedure.  (Dkt. 110 at 1.) In the supporting memorandum to their Motion for Summary Judgment, Defendants argue that:

- The Complaint is an improper shotgun pleading because it fails to allege specific constitutional violations by each Defendant under Section 1983, in particular that it is not clear who Mays intended to bring the asserted claims against because, while some Defendants are listed in the "Master List,"[8] there are no factual allegations made against them, he includes eight defendants not listed in the "Master List" in his subsequent nine claims, and because Mays simply lists Constitutional Amendments and asserts negligence with "little more" (Dkt. 112 at 4-6);

- Mays failed to execute proper service on any of the Defendants as none of them have been personally served given that many of the summonses are addressed only to a first name and although, "the United States Marshal Service returned a summons as 'executed,' the record shows this document is sparsely filled out with little information," and was not signed by the named Defendant (*id.* at 6-8);

- Mays failed to bring his claims against Defendants in their official capacities because he failed to "allege his constitutional rights were violated by some policy, custom, or practice adopted by Sherburne County," rendering summary judgment appropriate,[9] and because he

---

[8]    The Court understands the "Master List" to be the "Defendants List Master" in the Complaint, and uses the terms interchangeably.

[9]    At times, Defendants argue that summary judgment is appropriate due to a failure to "allege" certain facts.  (*See, e.g.*, Dkt. 112 at 9 ("In this case, Plaintiff did not clearly allege his constitutional rights were violated by some policy, custom, or practice adopted by Sherburne County.  Accordingly, Sherburne County Defendants are entitled to summary judgment on Plaintiff's official capacity claims.").)  As discussed in Section III.A, a motion under Rule 12(c) is based on the allegations in the pleadings, while a motion under Rule 56 is based on evidence or lack thereof.  The Court has applied the

cannot establish a meritorious claim against Defendants individually for liability to attach to the Jail (*id.* at 8-10);

- The Jail is not a legal entity subject to suit (*id.* at 10);

- Mays cannot establish a deliberate indifference claim with respect to the tinted eyeglasses and medical bucket/foot soaks given that he failed to allege specific acts each Defendant undertook; cannot establish he had a serious medical need for eyeglasses and his ingrown toenail; had access to water to conduct the recommended foot soaks for his ingrown toenail; does not allege Defendants were subjectively aware to have violated his constitutional rights, and that regardless, Defendants would be entitled to qualified immunity for his tinted eyeglasses claim because they reasonably relied on the judgment of medical professionals and because the medical records, kites, and grievances demonstrate that his medical complaints were not disregarded; and that his official capacity claims also fail because there is no evidence he was deprived of constitutionally adequate medical care through a policy, custom, or official action (*id.* at 10-23);

- Mays failed to establish a failure to protect claim against Defendant Kolar because he does not state who the inmate that assaulted him was, whether that inmate heard the statement Mays alleges Defendant Kolar stated, or whether the alleged attack was related to Defendant Kolar's statement, and that Mays also failed to establish a claim against Defendant Clem for similar reasons (*id.* at 23-26, 37-38);

- Mays failed to establish he suffered a constitutional violation or injury from his temporary exposure to a broken toilet, does not allege how the Defendants "were directly involved in, aware of, or otherwise responsible for the conditions of his cell," and his "self-serving" statements to medical staff regarding his constipation, rash, and hemorrhoids and refusal to be examined are insufficient to establish that he suffered any injury as a result of the condition of his cell (*id,* at 26-30);

- Mays failed to establish a retaliation claim and a failure to intervene claim against Defendants Johnson, Kolbinger, and Paul, and regardless, Defendants would be entitled to qualified immunity, moreover, Mays

---

appropriate legal standard to Defendants' arguments to the extent it can discern whether Defendants seek dismissal as to each claim based on Rule 12(c), Rule 56, or both.

admitted that he committed the infraction for which Defendant Jess wrote him up (*id.* at 30-33);

- Mays failed to establish a claim against Defendants Lumply and Lunstrom for alleged sexual comments because he does not provide specifics about what the comments were or that he suffered any injury and does not state a claim for relief regarding him being housed near inmate J.B., as he fails to specify what involvement the Defendants had with the housing, and that there is no evidence that inmate J.B. inflicted any physical harm or attack on him (*id.* at 33-36); and

- Mays failed to establish that the disciplinary hearing at the Jail violated his due process rights and does not specify who this claim is directed against.

(Dkt. 112 at 38-43.)

In his SJ Response, Mays disputes Defendants' assertions that he failed to bring claims against them in their official capacities. (Dkt. 133 at 1.) Mays asserts that his constitutional rights were violated due to the "jail[']s failure to properly train [its] staff on what to do when an inmate[']s] toilet in his cell is not working properly" and because "jail staff repeatedly ignored multiple reports from both the plaintiff as well as jail staff regarding the plaintiff[']s non working toilet"; that the Jail made it "possible" for inmate J.B. to continuously harass him by placing them directly across from each other; that the Jail has an "unwritten policy that denies all inmates to call staff members as witnesses in disciplinary hearings"; and that, with respect to his claim relating to the tinted eye-glasses and medical bucket/foot soaks, Defendants' supporting memorandum to their Motion for Summary Judgment omits various facts, including that Mays arrived at the Jail "with an arm sling on [his] arm & that [he] had several referrals & appointments schedule[d] with different hospital [including to see an eye doctor] prior to coming to the [Jail] for [his]

medical issues from [his] car accident," but the Jail staff failed to follow the recommendation that he wear eyeglasses.  (Dkt. 133 at 1-3.)

In their SJ Reply, Defendants contend that Mays failed to oppose their Motion for Summary Judgment, and as a result, waived the following arguments:

- The Jail must be dismissed because it is not a legal entity subject to suit;

- Plaintiff failed to identify specific constitutional violations against individually named Defendants;

- Claim 2 must be dismissed because Plaintiff failed to demonstrate he was involved in an altercation with another inmate because of any statements made by Officer Kolar, nor did Plaintiff show he suffered any harm;

- Claim 3 must be dismissed because Plaintiff failed to show he suffered any objectively serious harm related to his temporary exposure to a broken toilet, and furthermore, Plaintiff failed to establish any specific conduct or constitutional violation by any of the 20 individually named Defendants;

-  Claim 4 must be dismissed because Plaintiff failed to establish any of the elements necessary to support a claim of retaliation against Officer Jess, and furthermore, Plaintiff failed to establish Officers Johnson, Paul, and Sergeant Kolbinger had a duty and failed to intervene;

- Claim 5 must be dismissed because Plaintiff failed to allege a cognizable claim against Officer Lumply and Sergeant Lunstrom for a nondescript sexual statement and threat, moreover, the alleged risk to his mental health is insufficient to meet the required showing of harm and verbal threats or statements alone are insufficient to constitute a constitutional violation;

- Claim 6 must be dismissed because Plaintiff failed to demonstrate any evidence Officer Clem told a group of inmates Plaintiff snitched on another inmate or that he suffered any harm as a result of the alleged comment;

- Claim 7 must be dismissed because Plaintiff failed to establish any specific conduct against any of the individually named Defendants with

respect to his housing near Inmate J.B., and furthermore, Plaintiff failed to demonstrate he suffered any objectively serious harm;

- Plaintiff's Claim 8 must be dismissed because Plaintiff's ingrown toenail was not a serious medical condition, and furthermore, Plaintiff offered no medical evidence demonstrating a delay in his foot soaks had a detrimental effect; and

- Plaintiff's Claim 9 must be dismissed because Plaintiff failed to identify this "unknown" Sergeant, and furthermore, Plaintiff also failed to implicate a constitutionally protected liberty interest.

(Dkt. 136 at 2-5.)

Defendants also maintain that Mays failed to support his official capacity Claims 1, 3, 5, 7, and 9 because he failed to establish any underlying constitutional violations for any of those claims, failed to present any affirmative evidence but instead relied on his allegations, failed to allege a failure-to-train claim in the Complaint, did not make allegations as to the Jail's failure to discipline in the Complaint, and his allegations regarding the Jail having an unwritten policy denying inmates the ability to call staff members as witnesses in disciplinary hearings are not included in the Complaint.  (*Id.* at 5-10.)

**B.    Requests to Preserve Recordings**

In his initial Request to Preserve Recordings, Mays asks the Court to enter an order directing Defendants to "preserve and remain intact" several discovery materials "relating in any manner to this case," including various videos from body worn cameras and recordings from several disciplinary hearings that mainly occurred in September and October 2021.  (Dkt. 134 at 1-4.)  "[By] way of illustration," Mays provides an enumerated list of materials he seeks to preserve, including:

17

1. Evidence or records of information arguably subject to disclosure, discovery, inspection or subpoena pursuant to Rules 6(e), 7(f), 16(a) and 17 of the Federal Rules of Criminal Procedure, especially those Video footage requested in plaintiff['s] pretrial motions;

2. Evidence or records of information arguably subject to production or disclosure at trial pursuant to 18 U.S.C. § 3500 or Rules 612 or 613(a) of the Rules of Evidence for United States Courts and Magistrates; and

3. Evidence or records of information arguably favorable or useful to the accused.

(*Id.* at 1.)

Mays argued:

1. Any of the above in the possession, custody or control of the Defense may be required for the scrutiny of the Court or defense counsel during litigation of the case. The purpose of the Motion is to preserve such evidence. It is occasioned and necessitated by the administrative practice of alleged good-faith destruction of records by the Defen[s]e, e.g., United States v. Williams, 604 F.2d 1102 (8th Cir. 1979); United States v Niederberger, 580 F.2d 63 (3d Cir. 1978), cert. denied, 439 U.S. 980 (1979);[ ]United States v. Mase, 556 F.2d 671 (2d Cir. 1977), cert. denied, 435 U.S. 916, 98 S. Ct. 1472, 55 L. Ed. 2d 508 (1979)[; ]United States v Harris, 543 F.2d 1247 (9th Cir. 1976).

4. Petitioner believes that the information contained in said tapes will be crucial to his case, and as such constitutes potential Brady material.
5. Petitioner knows that it is the policy of the Sherburne County Jail to destroy all such tapes within 45 days, absent a Court Order to preserve the tapes.

(*Id.* at 1.)

In his subsequent Request to Preserve Recordings, Mays requests video footage from various areas of the Jail and certain body worn cameras. (*See* Dkt. 138 at 1-6.) Mays submitted several exhibits with this request, including grievances, kites, and disciplinary hearing reports. (Dkts. 138-1 at 1-27.)

Defendants filed a response to the Requests to Preserve Recordings on March 14, 2022, contending that the videos requested by Mays are irrelevant to this suit as the majority of them constitute footage recorded after they filed their Motion for Summary Judgment and eleven months after the discovery deadline.  (Dkt. 144 at 1-2, 5-17.)  Defendants also argue that to the extent Mays seeks a modification of the Scheduling Order, he has failed to demonstrate good cause and has failed to meet his burden for a preservation order.  (*Id.*)

Mays timely filed a reply on June 3, 2022.  (Dkt. 150; *see also* Dkt. 149 (setting deadline as June 13, 2022).)  In his reply, he argues that good cause to amend the schedule and allow additional discovery exists due to his "more than 7" transfers from one jail to another, and that those transfers resulted in lost documents and a lost USB drive, as well as due to his need to quarantine for each transfer.  (Dkt. 150 at 1-2.)  Mays also argues that his prescription for rose-tinted glasses issued by "Institutional Eye Care" on January 23, 2022 is evidence that he could not have obtained before the discovery deadline passed.  (*Id.* at 2; *see* Dkt. 137 at .)  Mays makes additional arguments relating to the merits of his claims and why video footage that post-dates the incidents at issue are relevant to his claims in this reply.  (*See generally*, Dkt. 150 at 3-14.)

## C.    **Motion for Hearing**

Mays also seeks an evidentiary hearing "to determine whether and why the United States Marshal Service and Sherburne County Jail are depriving [him] of the medical care he requires."  (Dkt. 137 at 1.)  Mays alleges that "before returning to the Sherburne County Jail" for resentencing, he fell off a top bunk at the Grady County Law

19

Enforcement Center ("Grady Center") (where he was housed for a short period of time) due to a seizure he had, resulting in a concussion and several injuries to his body, and that he notified the Jail staff of this and has been "having these issues as well as similar issues since he was previously incarcerated in the Sherburne County Jail in 2019." (*Id.* ¶ 2.) Mays further asserts that he returned to the Jail in September of 2021 and has since filed multiple kites with the Jail and medical department regarding his medical issues to no avail. (*Id.*) Mays maintains that he was seen at "Institutional Eye Care" on January 23, 2022, at which time he was "diagnos[ed] with some eye issue which the doctor pr[e]scribed [him] Rose Tint eye glasses for" but has however been denied said glasses "by the USM" "due to the fact [that] he has not been in the Sherburne County Jail for more than a year." (*Id.*) He claims that in 2019, a doctor at "Edina Eye" "recommended Fl-41 glasses" for his light sensitivity issues but that he was denied those glasses by the Jail "due to the fact that the [J]ail says that sunglasses are not allowed in their facility." (*Id.*) Lastly, Mays claims that he was seen by a physical therapist in 2020 for a shoulder injury, who referred him to an orthopedic doctor, but that the Jail has refused to allow him to make the visit. (*Id.* at 2.)

Defendants responded to the Motion for Hearing on March 14, 2022, alleging that the Court had previously denied similar medical claims brought by Mays. (Dkt. 143 at 1-3, 5.) Defendants also argue that Mays has not offered any evidence to substantiate his claim regarding his alleged shoulder injury and that to the contrary, Mays' medical record shows that he was seen for shoulder pain and subjective numbness in his right arm on May 21, 2019 at NovaCare Rehabilitation, and that the physical therapist that attended to

him "did not find nerve damage or any other injury, and stated Plaintiff required no further treatment or care." (*Id.* at 5-6.) Defendants contend that Mays is unlikely to succeed on the merits of his claim regarding the denial of medical care; that Mays has not made medical providers from MEnD Correctional Care ("MEnD") or the U.S. Marshals Service parties to this suit; that Mays failed to demonstrate the need for an emergency hearing or preliminary injunction; and that to the extent Mays requests permission to amend his Complaint, that request should be denied as the deadline to seek such a request has long passed. (*Id.* at 6-7.)

Mays timely mailed his reply on June 1, 2022. (Dkt. 151, Dkt. 151-1 (postmarked June 1, 2022); *see also* Dkt. 149 (giving Mays until June 13, 2022).) Mays argues in the reply that "a lot has changed since the court previously denied [his] request for an emergency hearing related to [his] current medical issues" given that his medical needs were not met and due to his fall while at the Grady Center. (Dkt. 151 at 1.) Mays references the car accident he had in 2019, which he claims led to a concussion and several injuries, and says that he had written various kites for his medical issues "while [he] was in the SCJ" but medical appointments with outside providers were not scheduled for him until his "attorney filed on motion to be heard on [his] lack of medical care which was granted." (*Id.*) Mays contends that during an appointment with a physical therapist, he was told he "needed to see an 'orthopedic doctor'" for his "trapped nerve," which is documented in his medical chart, and while he concedes that the physical therapist "stated he did not find any nerve damage or any other injury and stated the plaintiff required no further treatment or care," he argues that he was reexamined by a different

physical therapist "who recommended" that he "needed to be seen by an orthopedic doctor and have an EMG." (*Id.* at 2.)

Mays further argues that medical staff at the Jail determined that he needed to "be re-examined again by physical therapy not [him]. So obviously the medical personnel at the SCJ felt that something was not correct." (*Id.* at 3.) Mays asks the Court to order Defendants to provide him with his medical chart from his time at the Jail in 2021 so that he may prove this issue and states that this issue is similar to when he was "recommended . . . FI-41 tinted eye glasses" which the "Jail completely ignored," after which he was "re-examined by another Eye doctor at the SCJ who stated [he] had an phototibia [sic] and prescribed [him] 'Rose tinted eye glasses." (*Id.*) Mays contends that he is "not just disagreeing with the medical care" but is arguing that "the medical was inappropriate because they fail[ed] to follow the recommendation and medical advice of outside providers," and maintains that "multiple courts have stated that medical departments and the[i]r supervisors can be held responsible if it can be shown that an outside doctor medical advice was ignored for no good reason," which he claims is the case here. (*Id.* at 3-5.) Mays argues that the Jail can also be "held responsible" because the Jail was aware of the medical staff and U.S. Marshals Service's actions and due to its "delibera[te] fail[ure] to correct these issues while [he] was in the[i]r care." (*Id.*) Mays disputes that this Motion raises new issues and argues that "[t]he eye care issue is the same. The shoulder and arm injury is [sic] the same" and asks the Court to allow him "amend one or supplement [his] complaint with the recent events alleged in [his] motion. Because these things only took place after the deadline." (*Id.* at 5.)

## III.    DISCUSSION

### A.    Defendants' Motion Under Federal Rules of Civil Procedure 12(c) and 56

As discussed above, Defendants seek judgment on the pleadings under Federal Rule of Civil Procedure 12(c), or in the alternative, summary judgment under Federal Rule of Civil Procedure 56.  (Dkt. 110 at 1.)

Pursuant to Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "In considering a motion for judgment on the pleadings under Rule 12(c), the court views 'all facts pleaded by the nonmoving party as true and grants all reasonable inferences in favor of that party.'"  *Yang v. City of Minneapolis*, Civil No. 21-2658 (ADM/ECW), 2022 WL 2160425, at *3 (D. Minn. June 15, 2022) (quoting *Poehl v. Countrywide Home Loans, Inc.*, 528 F.3d 1093, 1096 (8th Cir. 2008)) (cleaned up).  "As the Eighth Circuit held in *Westcott*, because motions to dismiss for failure to state a claim are subject to the same legal standard whether brought under Rule 12(b)(6) or Rule 12(c), the distinction is purely formal."  *Radcliffe v. Securian Fin. Group, Inc.*, 906 F. Supp. 2d 874, 883 (D. Minn. 2012) (quoting *Ali v. Frazier*, 575 F. Supp. 2d 1084, 1089 (D. Minn. 2008) (citing *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990)) (cleaned up). "Judgment on the pleadings is appropriate 'where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law."  *Yang*, 2022 WL 2160425 at *3. (quoting *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 803 (8th Cir. 2002)). "[T]he court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint,' as

well as materials that are 'necessarily embraced by the pleadings.'" *Porous Media Corp.*
*v. Pall Corp.*, 186 F.3d 1077, 1080 (8th Cir. 1999) (citations omitted).

When considering a motion to dismiss under Rule 12, the pleadings are construed
in the light most favorable to the non-moving party, and the facts alleged in the
complaints must be taken as true. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659,
665 (8th Cir. 2009). In addition, a court must afford the plaintiff all reasonable
inferences from those allegations. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852,
853 (8th Cir. 2010). At the same time, the complaint must allege "enough facts to state a
claim to relief that is plausible on its face' [and] 'a claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw a reasonable inference that
the defendant is liable for the misconduct alleged." *Yang*, 2022 WL 2160425 at *3
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009). Moreover, "where the operative complaint fails to provide notice
of the basis for a plaintiff's allegations and leaves the defendant without enough
information to compose an adequate response, it is properly dismissed, even before a
contemporaneous summary judgment motion is considered." *Larson v. Carlton Cnty.*
*Jail*, No. 17-CV-3551 (NEB/ECW), 2019 WL 4187839, at *1 (D. Minn. Sept. 4, 2019),
*aff'd*, 810 F. App'x 489 (8th Cir. 2020) (citing *Brooks v. Roy*, 776 F.3d 957, 960 (8th Cir.
2015)).

In assessing a pro se complaint, the court applies "less stringent standards than
formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per
curiam) (quotation and citation omitted); *accord Jackson v. Nixon*, 747 F.3d 537, 541

(8th Cir. 2014). "If the essence of an allegation is discernible," then a court, in applying a liberal construction to pro se complaints, "should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)). Despite the liberal construction of such complaints, the pro se plaintiff "still must allege sufficient facts to support the claims advanced." *Stringer v. St. James R-1 Sch. Dist.*, 446 F.3d 799, 802 (8th Cir. 2006) (quoting *Stone*, 364 F.3d 912, 914 (8th Cir. 2004)). Thus, pro se litigants "must set a claim forth in a manner which, taking the pleaded facts as true, states a claim as a matter of law." *Id.* (quoting *Cunningham v. Ray*, 648 F.2d 1185, 1186 (8th Cir. 1981)) (cleaned up).

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As this wording suggests, the initial burden of showing that no genuine issue of material fact exists lies with the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is "material" only if resolving it might affect a suit's outcome under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). When assessing a summary judgment motion, a court should believe the nonmovant's evidence and draw all

25

justifiable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

When ruling on a motion for summary judgment, the Court is not required to adopt the plaintiff's version of the facts when those facts are "so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 ( 8th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'" *Id.* at 790-91 (citations and internal quotation omitted).  When considering a motion to dismiss or for summary judgment, pleadings submitted by pro se litigants are held to less stringent standards than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).  Nevertheless, claims of even a pro se plaintiff cannot survive a motion for summary judgment unless the plaintiff has set forth specific facts demonstrating that there is a genuine issue for trial. *See Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

With this framework in mind, the Court turns to the parties' arguments.

### 1.    Defendants With No Factual Allegations Asserted Against Them

Mays included certain individuals in his Master List, including Defendants Andrea, Aric Hanson, Dave Isais, and Mike Siege, but does not make any factual

allegations against them in any of the asserted claims in the Complaint.  (*See* Dkt. 1 at 5-

10.)  Accordingly, these Defendants are due to be dismissed.  *Smith v. City of Moorhead*,

Case No. 20-cv-2533 (JRT/LIB), 2021 WL 2792405, at *3 (D. Minn. March 31, 2021)

(finding the complaint was frivolous with respect to defendants that were listed in the

complaint's caption but had no "factual allegation whatsoever related to any actions"

alleged against them).

### 2.    Section 1983 Claims

Defendants contend that a "suit against Defendants here in their official capacities

is in essence a suit against Sherburne County," that this case should be dismissed because

Mays failed to allege that his constitutional rights were violated by "some policy, custom,

or practice adopted by Sherburne County," cannot establish a meritorious claim against

any Defendant individually for liability to attach to Sherburne County, and the Jail is not

a "proper legal entity subject to suit and must be dismissed.  (Dkt. 112 at 8-10.)

According to Defendants, Mays failed to allege individual constitutional violations

against them because his claims are not substantiated with supporting facts.  (*Id.* at 4-6.)

Defendants also argue that while Mays includes certain defendants in his statement of

facts, those individuals are not listed on his "Defendants Master List," and should

therefore be dismissed.  (*Id.* at 5-6.)

According to Section 1983, "[e]very person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes

to be subjected, any citizen of the United States . . . to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law . . ." 42 U.S.C. § 1983. "The 'purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.'" *Hines v. Smith*, No. 16-cv-3797 (DSD/SER), 2018 WL 7050674, *2 (D. Minn. Dec. 20, 2018) (quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). "Public servants may be sued under section 1983 either in their official capacity, their individual capacity, or both." *Id.* (quoting *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) (citing *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).

### a.    Sherburne County Jail

Mays' claims against Defendant Sherburne County Jail can be quickly decided because "county jails are not legal entities amenable to suit." *Owens v. Scott Cnty. Jail*, 328 F.3d 1026 (8th Cir. 2003) (citations omitted). The Court therefore recommends dismissal of Mays' claims against Sherburne County Jail.

### b.    Official Capacity Claims

In his SJ Response, Mays argues that the Jail has a policy regarding eyeglasses; that the Jail failed to properly train its staff "on what to do when an inmate['s] toilet in his cell is not working properly" and that this issue was present both prior to him moving into the cell with the broken toilet and is still ongoing, thereby placing "multiple inmates at risk of having the same thing happen to them that happen[ed] to him"; that the Jail failed to discipline Defendant Lumply, who sexually harassed him; that the Jail "failed to have a plan to keep inmates with no contact separated from one another"; and that the Jail

has "an unwritten policy that denies all inmates to call staff members as witnesses in disciplinary hearings." (Dkt. 133 at 1.)

"Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Gladden v. Richbourg*, 759 F.3d 960, 968 (8th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)) (citation omitted).

"To establish liability in an official-capacity suit under Section 1983, a plaintiff must show either that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989) (citations omitted). A governmental entity's liability can result from "(1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019) (citing *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016)); *see also Calhoun*, 2019 WL 2079834, at *4 (same) (quoting *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013)).

The Eighth Circuit has explained that:

> [A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (quoting *Corwin*, 829 F.3d at 700 (internal quotation marks and citation omitted)).  Furthermore, "[t]he pattern of unconstitutional conduct must be so pervasive and widespread so 'as to have the effect and force of law.'" *Id.* (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996)).

For the most part, the Complaint alleges very little (if anything) about any policy, custom, or final authority leading to the alleged constitutional violations at issue or how each respective Defendant enacted or enforced an unconstitutional policy or custom, nor has it plausibly alleged how Defendants had final authority or used it in an unconstitutional manner.[10]  (*See* Dkt. 1 at 6-10; *see also Young Am.'s Found. v. Kaler*, 370 F. Supp. 3d 967, 980 (D. Minn. 2019) ("[W]hether suing a state defendant in their official or individual capacity, a plaintiff must plausibly allege that that official had some kind of personal involvement with the purportedly unconstitutional policy or action.")

---

[10]    Although Mays references a "memo" he received when denied his tinted eyeglasses that stated "Tinted eye glasses are not allowed in the facility due to the safety & security" (Dkt. 1 at 6 ¶ 1), his claim is based on the fact that this memo was "not true because [he] has seen multiple inmates with tinted eye glasses" and Defendants "allow[ed] other inmates medical eye glasses but den[ied]" tinted eyeglasses to Mays (*id.*) rather than alleging the tinted eyeglasses policy itself is unconstitutional.

(emphasis added); *Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 1019 (D. Minn. 2014) ("With respect to the claims for injunctive relief against the Individual Defendants and Bazzaro in their official capacities, these claims are deficient because they fail to plead that any constitutional violations perpetrated by the Individual Defendants and/or Bazzaro that were the result of an unconstitutional policy or custom of the University.") (citations omitted)).  Conclusory allegations, such as those made by Mays, are insufficient.  *See Lollie v. Johnson*, No. 14-cv-4784 (SRN/HB), 2015 WL 3407931, at *6 (D. Minn. May 27, 2015) (citation omitted) (dismissing under Rule 12(b)(6)).

Defendants argue in the SJ Reply that the Complaint does not allege a failure to train with respect to malfunctioning toilets, failure to discipline for sexual harassment, failure to separate "no contact" inmates, or a policy of denying inmates the ability to call staff members as witnesses in disciplinary hearings.[11]  (Dkt. 136 at 6-7.)  Having reviewed the Complaint, the Court agrees.  For example, Mays alleges in Claim 9 that he asked to have a CO and an inmate called as witnesses during a disciplinary hearing, and that they were not called or interviewed, but he never alleges the Jail has any unconstitutional policy with respect to witnesses.  (*See* Dkt. 1 at 10 ¶ 9.)  Claim 3 (malfunctioning toilet), Claim 5 (sexual harassment), and Claim 7 (failure to separate "no contact" inmates) are similarly devoid of any allegation of a unconstitutional custom or

---

[11]    Defendants also contend that "Plaintiff made no allegation regarding . . . his mental health in his original Complaint" (Dkt. 136 at 6), but that is incorrect (*see* Dkt. 1 at 6 ¶ 2 (alleging "mental injuries" in Claim 2); *id.* at 7-8 ¶ 5 (alleging harm to "mental health" due to sexual harassment and sexual abuse in Claim 5), 8-9 ¶ 7 (alleging suffering in the form of "Nightmares, Anxiety, Depression, Serve Headaches & Ect. [sic]" with respect to Claim 7).)

policy. (*See id.* at 6-9 ¶¶ 3, 5, 7.) Moreover, the Complaint does not allege any

unconstitutional policy or custom with respect to Mays' medical bucket/foot soak

treatment, and Mays did not argue to the contrary in his SJ Response. The failure to

allege any unconstitutional policy or custom with respect to Mays' claims means

Defendants did not have fair notice of the basis for any official capacity claims based on

the facts the Complaint does allege, which is sufficient reason to recommend dismissal of

those claims under Rule 12(c). *See Larson*, 2019 WL 4187839, at *2 (dismissing First

Amendment claims for failure to give fair notice of the basis for the alleged

violations), *aff'd*, 810 F. App'x 489. Moreover, Mays has offered no evidence to support

his assertions of unconstitutional policies or customs with respect to these claims. (Dkt.

133 at 1.) Neither does Mays allege a "continuing, widespread, persistent pattern of

unconstitutional misconduct" nor does he provide any factual allegations to that effect to

survive the first element of the *Brewington* test. *See Munt v. Schnell*, Case No. 19-CV-

1142 (NEB/ECW), 2020 WL 4382811, at *25 (D. Minn. July 31, 2020) (finding

plaintiff's "custom-based claim of official liability fail[ed] at the first element of the

*Brewington* test: the Amended Complaint does not allege 'a continuing, widespread,

persistent pattern of unconstitutional misconduct.' . . . he provides no factual allegations

in support of this claim. . . . As a result, the Court recommends dismissing without

prejudice the Amended Complaint's official capacity claims.").

The Court addresses in more detail Mays' allegation that he was denied tinted

eyeglasses and given "a memo by the clinic [that] 'Tinted eye glasses are not allowed in

the facility due to the safety & security.' But this is not true because I have seen multiple

inmates with tinted eye glasses." (Dkt. 1 at 6 ¶ 1 (citing Dkt. 1-1 at 2).; *see also* Dkt. 133 at 1 (alleging policy is reason why he was denied tinted eyeglasses).) To the extent Mays alleges a policy of denying tinted eyeglasses, this allegation is rendered implausible by his simultaneous allegation that he has "seen multiple inmates with tinted eye glasses." (Dkt. 1 at 6 ¶ 1.) Moreover, the "memo" (which is actually a note to him from medical staff) states:

> As we informed you before. Tinted glasses are not approved of at the jail for safety and security reasons. We can check your vision to make sure you aren[']t having any issues with that. Increase your water intake, monitor your salt intake and OTC is available if you have a headache. Followup as needed[.]

(Dkt. 1-1 at 2.)

The record of Mays' grievances indicates that he was told that "tinted non-prescription glasses (sunglasses) are not allowed in the jail" but "[t]inted **prescription** glasses are allowed in the jail." (Dkt. 119-1 at 235 (emphasis added).) Mays was also told that it was the U.S. Marshals Service and MEnD's decision as to whether tinted non-prescription glasses would be permitted in the Jail. (*Id.* at 312.) While Mays may disagree with the decision to deny him tinted eyeglasses notwithstanding a "recommendation" (rather than a prescription) for them to address his photophobia (Dkt. 119-1 at 77, Dkt. 191-5 at 253), this is insufficient to raise a genuine issue of material fact as to an unconstitutional policy or custom relating to tinted eyeglasses.

Finally, as "a general rule [], in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (collecting cases). Because the Court

recommends dismissal of Mays' individual capacity claims for the reasons stated below in Section III.A.2.c, the Court also recommends dismissal of the official capacity claims on this ground.

For all these reasons, the official capacity claims against Defendants should be dismissed.

### c.    Individual Capacity Claims

Defendants argue that the claims asserted against them in their individual capacities should be dismissed and that they are entitled to qualified immunity.

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "Government officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) (citations omitted). The doctrine of vicarious liability is inapplicable in Section 1983 suits. *Iqbal*, 556 U.S. at 676. "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [the plaintiff] must allege **specific facts** of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (emphasis added) (citations omitted). However, "a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014). "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is

34

involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Id.* (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).

### i.  Tinted Eyeglasses and Medical Bucket/Foot Soaks Deliberate Indifference Claims

Mays alleges in the Complaint that Defendants Janail Hussian, Adam Walkley, Travis Lunstrom, Demar, Bryan, Bjergo, Patt Carr, Brian Franks, Bloom, and Zerwas violated his First, Fifth, Eighth, and Fourteenth Amendment rights by denying him tinted eyeglasses.  (Dkt. 1 at 6 ¶ 1.)  Mays contends that he was "given a memo by the clinic" stating that "tinted eye glasses are not allowed in the facility due to the safety & security," but that "this is not true because [he has] seen multiple inmates with tinted eye glasses."  (*Id.*)  Mays also alleges that Defendants Bartell, Mccdona, Lumply, Patton, Kolar, Ms. K, Thompson, Rachael Clem, Zack, and Lori violated his Fifth, Eighth, and Fourteenth Amendment rights by denying him medical care from November 2019 until December 2019 because they failed to refill his medical bucket with water for his foot soak treatment, causing him to develop an infection and other health issues.  (*Id.* at 9 ¶ 8)

Defendants argue that Mays failed to attribute specific acts to them; that Mays' medical records, kites, and grievances demonstrate his complaints were not disregarded; that Mays was referred to outside specialists for his complaints and the evidence shows Defendants did not deny him access to water for his foot soaks; that Mays failed to establish he had serious medical needs; that Mays failed to establish Defendants were subjectively aware of a substantial risk of harm to him; and that it was MEnD staff, who

have not been made a party to this litigation, not Defendants, that determined that the tinted eye-glasses were unnecessary.  (Dkt. 112 at 13, 16-18, 21-23; Dkt. 136 at 7-9.)

Mays responds that he had several "referrals & appointments schedule[d] with different hospital [sic] prior to coming into the [Jail] for [his] medical issues from [his] car accident," including an appointment to see "an eye doctor" and to undergo "CT [scans] which is used to look at people who may or may not have HEAD injuries, ophthalmology which is for people who may or may not have eye issues, neurology, physical therapy & radiology."  (Dkt. 133 at 1-3.)  Mays argues that he was recommended "Fl-41 eye glasses to minimize symptoms of photo-sensitivity" by an ophthalmologist at the Edina Eye Clinic, however, the "medical department along with jail admin Brian Frank" disregarded that recommendation due to the Jail's policy regarding safety and security as it relates to tinted eye-glasses, which violates his rights; that Defendant Hassain, "the jail medical provider," is liable for deliberate indifference because he was only provided with eyedrops and over-the-counter medication, which he had been using without benefit prior to seeing an eye specialist; and that he waited two months "before receiving any medical attention for his injuries."  (*Id.* at 2-3.)

As a pretrial detainee, Mays' "right to medical care arises under the Due Process Clause of the Fourteenth Amendment" rather than the Eighth Amendment.  *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (citing *Vaughn v. Greene Cnty.*, 438 F.3d 845, 850 (8th Cir. 2006)); *see also Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993).  Although, Mays "claim[s] [are] rooted in the Fourteenth Amendment, [the Court applies] the deliberate-indifference standard that governs claims brought by convicted inmates

under the Eighth Amendment." *Jackson*, 756 F.3d at 1065; *Fourte v. Faulkner Cnty.*, 746 F.3d 384, 387 (8th Cir. 2014)).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05. But "this does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) ("The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.") (citation omitted). "Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (citations omitted).

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that

the prison officials actually knew of but deliberately disregarded those needs." *Id.* "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (citation omitted). To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

First, while Mays has made factual allegations against Adam Walkey and Thompson in the Complaint, those individuals are not listed in Mays' "Defendants Master List," no summonses were issued for them, and there is no indication that either of them have been made aware of this action. (*See* Dkt. 1 at 5; *see also* Dkts. 11-14, 31.) Additionally, Defendants assert, and the evidence shows, that Defendant Janail Hassian is a MEnD staff member, not a Jail employee, and MEnD has not been made a party to this suit.[12] (*See* Dkt. 1 (Complaint stating Hassian is a "Medical Provider"); *see also* Dkt. 119 ¶ 2 (Declaration of Thomas Zerwas, Captain of the Jail) (stating that "Sherburne County contracts with MEnD Correctional Care to provide medical services and medical staff to attend to the medical care of the inmates, including Mr. Mays, held in the [Jail]. MEnD medical staff are not county or [J]ail employees."); Dkt. 112 at 7 n.1 ("Defendants never

---

[12] The Court notes that on June 14, 2021, Mays filed a "Request for Entry of Default" against Defendant Janail Hassian for failure to plead or otherwise defend. (Dkt. 87 at 1.) This request is improper because, as discussed in this Section, there is no indication in the record that Hassian was ever served.

entered an appearance on behalf of Janail Hassian.").)  Indeed, there is no indication that MEnD employee Hassian was ever served, as the only process receipt and return indicates only that "Diane Arnold" was served with an unspecified summons or summonses.[13]  (*See* Dkt. 31; *see also* Dkt. 14 at 15-16 (summons for Hassian).) Accordingly, the Court recommends dismissal of any claims against Walkey, Thompson, and Hassian.  *See Mason v. Minnesota Dep't of Human Servs.*, No. 16-cv-2340 (JRT/LIB), 2017 WL 1555888, at *1 n.1 (D. Minn. April 3, 2017) ("In the body of Plaintiffs' Complaint, in the section where Plaintiffs listed each Defendant's full name, official position, and place of employment Plaintiffs also list Shelby Richardson as an additional Defendant.  This, however, appears to be a clerical error as she is not in the caption of Plaintiffs' Complaint and Plaintiffs do not appear to have requested a summons in her name. . . .  As such, the Court does not include her as a Defendant in the present case.  In any event, her inclusion or exclusion does not affect the Court's analysis in the present Report and Recommendation."); *see also Flowers v. Dubbs*, Civil No. 10-1555 RHK/AJB, 2011 WL 2412906, at *5 (D. Minn. May 9, 2011) (recommending dismissal for failure to serve where U.S. Marshals Service was unsuccessful in serving a defendant and because the plaintiff failed to make any subsequent effort to obtain service, show good cause, or seek additional time).

Next, the Court considers Mays' tinted eyeglasses claim.  As to the objective standard, courts have found a serious medical need to wear eyeglasses in cases where the

---

[13]     The Court addresses service in more detail in Section III.A.2.c.vii.

plaintiff's uncorrected eyesight fell within the parameters of legal blindness, *Benter v. Peck*, 825 F. Supp. 1411, 1416-17 (S.D. Iowa 1993), or where the plaintiff alleged that his specially prescribed, tinted eyeglasses, fitted with a prism, were necessary to ameliorate double vision and a loss of depth perception resulting from a head injury, and that their confiscation resulted in a permanent loss of vision, headaches, and injuries from falling or walking into objects, *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996). Here, Mays has not alleged that he was legally blind without his eyeglasses. Neither has he alleged permanent damage to his eyes or such serious impairment of his vision that it caused him to suffer injuries because he did not have tinted eyeglasses, or that his daily activities or ability to read and write were impaired. Thus, Mays has not alleged facts that would satisfy the objective component of an Eighth Amendment claim. *See Peppin v. Bodie-Miner*, No. 16-cv-1320 (ADM/JSM), 2016 WL 7368194, at *8 (D. Minn. Nov. 29, 2016), *R. & R. adopted*, 2016 WL 7366082 (D. Minn. Dec. 19, 2016) (recommending that defendants' request for dismissal under Rules 12(b)(1) and 12(b)(6) be granted and finding: "Here, however, plaintiff did not allege that he was blind without his eyeglasses, nor did he claim to have suffered any physical symptoms resulting from a lack of corrective treatment. Thus, plaintiff has not met the objective component of an Eighth Amendment claim.") (footnote omitted).

    As to Defendants' Rule 56 arguments, Mays also has not identified any evidence indicating the objective prong is met as to his tinted eyeglasses claim. Although he argues that he suffered from photo-sensitivity when he first came to the Jail and suggests that his referral to an eye doctor demonstrates a serious medical need, a "plaintiff's self-

diagnosis alone will not suffice to establish serious medical condition." *Mills v. Anderson*, 271 F. App'x 551, 552 (8th Cir. 2008) (citing *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994)). In Mays' case, while the doctor **recommended** tinted eyeglasses, Mays has not offered any evidence that tinted eyeglasses were prescribed or medically necessary to treat his photophobia. *See Cerilli v. Rell*, No. 3:08CV242 SRU, 2010 WL 3827960, at *7 (D. Conn. Sept. 23, 2010) (finding absence of eye doctor's determination that plaintiff was required to wear glasses tinted more than 30% meant the plaintiff had "failed to demonstrate that he suffered from an objectively serious medical condition requiring that he wear light-sensitive glasses tinted more than 30%"). Mays therefore has not shown a genuine issue of material fact as to the objective prong with respect to his tinted eyeglasses claim.

As to the subjective prong of an Eighth Amendment Claim, Mays has not alleged any facts to show that Defendants knew that he had a serious medical need for the tinted eyeglasses or that they deliberately disregarded his needs. He does allege that he was denied "medical eye glasses" and "tinted eye glasses," but his conclusory allegation that the recommended eye glasses were "medical" does not plausibly state a claim that any Defendant knew he had a serious medical need for those glasses or that any Defendant deliberately disregarded it. Moreover, the "memo" attached to the Complaint is from a MEnD employee, Hassian, for whom there is no indication that she was served, and the attached "memo" from Hassian states: "Tinted glasses are not approved of at the jail for safety and security reasons. We can check your vision to make sure you arent [sic] having any issues with that. Increase your water intake, monitor your salt intake and

OTC is available if you have a headache.  Followup as needed."  (Dkt. 1-1 at 2.)  Nothing in this memo indicates Hassian knew that Mays had a serious medical need for tinted eyeglasses; rather, it indicates that Hassian did not believe the tinted eyeglasses were medically necessary and that she offered alternative care for any vision issues or headaches.  As such, the allegations in the Complaint fail to meet the subjective prong and therefore fail to state a claim upon which relief can be granted.  *See Peppin*, 2016 WL 7368194 at *8 ("[P]laintiff failed to allege any facts showing that Severson knew that he had a serious medical need to wear eyeglasses.  Consequently, plaintiff does not meet the subjective prong of an Eighth Amendment claim.  Accordingly, this claim should be dismissed).

As to Rule 56, Mays has also not offered any evidence that creates a genuine issue of material fact as to the subjective prong of an Eighth Amendment Claim.  Defendants submitted the declaration of Thomas Zerwas, Captain of the Jail, who attested that "Sherburne County contracts with MEnD Correctional Care to provide medical services and medical staff to attend to the medical care of the inmates, including Mr. Mays, held in the [Jail]" and that "MEnD medical staff are not county or jail employees."  (Dkt. 119 ¶ 2.)  MEnD is not a party to this suit.  Mays attempts to impute the actions (or inaction) of MEnD medical staff to Defendants, and states that the "medical department along" with the Jail staff denied the recommendation that he obtain tinted eye-glasses.  (Dkt. 133 at 2.)  The Court finds Mays' arguments unpersuasive.

An Eighth Amendment violation occurs when the indifference is manifested by "prison guards intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once **prescribed**." *Estelle*, 429 U.S. at 104-05 (emphasis added). Based on the record, Mays was not prescribed tinted eyeglasses, nor did any medical professional deem them medically necessary. To the contrary, the record shows (and Mays agrees) that the tinted eye-glasses were **recommended**. (*See* Dkt. 133 at 2 (Mays' SJ Response) (stating "an EYE specialist RECOMMENDED a treatment" and arguing "[m]ade an [sic] recommendation for the plaintiff to get the 'Tinted eye glasses' instead [of] prescribing them makes no big deal because wither [sic] way the defendant stated that the 'tinted eye glasses' are not allowed in the SCJ due to safety & security"); *see also* Dkt. 119-5 at 253 (Edina Eye Clinic report for Mays' June 13, 2019 visit, "[r]ecommend[ing] use of FL-41 to minimize symptoms of photosensitivity."); Dkt. 119-1 at 65, 67, 235, 312 (MEnD staff July 1, 2019 response to Mays' grievance, stating that "[t]he medical provider reviewed the **recommendation** from outside eye appointment. The darkened lenses were not deemed medically necessary at this time.") (emphasis added).

Moreover, the record shows Mays' complaints relating to his eyes were attended to. Mays filed several grievances regarding the tinted eyeglasses. (*See* Dkt. 119-1 at 34, 64, 66, 76, 234, 276, 311.) Each of those grievances were promptly answered either by Jail staff or MEnD employees. (*See id.* at 35, 37, 65, 67, 77, 235, 277, 312.) Mays' complaints about light sensitivity were not ignored; he was referred to an ophthalmologist at Edina Eye Clinic. (Dkt. 119-5 at 7-8, 19, 43, 52, 77, 87, 105-06, 110, 251-53.) Mays was also provided eyedrops, rest, and ibuprofen as treatment remedies, and it was noted that he was not taking his ibuprofen. (*Id.* at 56, 60, 63, 67, 82, 140-41, 143.) On August

30, 2019, it was reported that Mays stated his interest to "continue [his] eye drop as they helped [his] eye issue" and he made a similar request on October 3, 2019. (*Id.* at 140-41, 143.) On January 5, 2020, Mays stated that "his eye drops do not work on him" but then made additional requests for eye drops on January 24 and 28 and February 12, 2020, stating that they had been helping. (*Id.* at 188, 193, 197, 207.) MEnD staff reported on April 8, 2019 that Mays stated he "had a vision screening while at [Hennepin County Medical Center] and does not have an eyeglass prescription and never has." (*Id.* at 50.)

While Mays was not permitted tinted eyeglasses, the Eighth Circuit has found that "nothing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment. Prisoners do not have a constitutional right to any particular type of treatment" and "Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (finding that a detainee's argument that a prison doctor was deliberately indifferent to his medical need because the prison doctor failed to follow another doctor's recommendation that the detainee use tranquilizers failed "because it is merely a dispute over the course of treatment. The prison officials' decision not to treat Long with tranquilizers is 'a classic example of a matter for medical judgment' that does not rise to the level of cruel and unusual punishment.") (citations omitted); *Cerilli*, 2010 WL 3827960, at *7 (finding "a simple difference of medical opinion is insufficient" to prove the subjective prong when plaintiff was not permitted glasses with the tint he desired). The Court therefore finds that Mays has not shown a genuine issue of material fact as to the subjective component

of his Eighth Amendment claim relating to tinted eyeglasses, where tinted eyeglasses were recommended (not prescribed), where he was provided with eyedrops and ibuprofen, and told to rest his eyes to relieve his symptoms, and where Mays declined (at times) to take ibuprofen and stated at times that the eyedrops helped.

The Court turns to Mays' medical bucket/foot soak claims. Mays alleges that Defendants violated his rights by failing to change the water used for his foot soak treatment for his ingrown toenail. (Dkt. 1 at 9 ¶ 8.) Defendants argue that Mays' ingrown toenail did not constitute a serious medical need, that there is no evidence showing he required surgery, antibiotics, or the administration of other medications, and that there is no evidence that Mays' ingrown toenail led to an infection or caused him unnecessary pain. (Dkt. 112 at 22.)

As an initial matter, "[a] number of courts have found as a matter of law that an ingrown toenail does not constitute a sufficiently serious medical need." *Mayes v. Aguilera*, No. 2:18-CV-0002 JAR, 2019 WL 4419064, at *6 (E.D. Mo. Sept. 16, 2019) (citing *Langford v. Prima*, No. 17-cv-11862, 2018 WL 659247, at *4 (E.D. Mich. Feb. 1, 2018) (collecting cases)). "Other courts have found the pain associated with an ingrown toenail, and the risk of infection or other complications following its removal, may qualify it as an objective, serious medical need." *Id.* (collecting cases). The Court declines to find as a matter of law that an ingrown toenail can never qualify as a serious medical need under the Eighth Amendment, and focuses on Defendants' Rule 56 arguments with respect to this claim.

Here, Mays alleges that he developed an infection that caused him a great deal of pain and other undisclosed health issues because his medical bucket was not filled with materials needed for his prescribed "foot soak treatment." (Dkt. 1 at 9 ¶ 8.) The Court summarizes the relevant record with respect to Mays' foot soak allegations. After receiving approval from Mays, MEnD requested and received Mays' medical records from Hennepin County Medical Center ("HCMC") shortly after Mays arrived at the Jail in order to assess him. (*See* Dkt. 119-5 at 1-294.) On March 19, 2019, MEnD reported that Mays visited HCMC on February 7, 2019, who noted concerns with his right foot, including that "there [was] cortical irregularity of the medial aspect of the distal first metatarsal, which ha[d] more of chronic appearance. there [was] soft tissue swelling in the region which may be acute or chronic." (Dkt. 119-5 at 15.) On March 21 and 25, 2019, MEnD staff reported that Mays was walking fine with no limp or signs of pain, and on May 28, 2019, an x-ray was performed on May's right foot, showing no acute findings and noting: "Deformity of the head of the 1st metatarsal as a result of bunionectomy. [T]here is still soft tissue swelling present in the area. [N]o effusion. [N]ormal for age. [T]he foot is normal otherwise." (*Id.* at 16, 19, 37, 232.)

On November 7, 2019, MEnD staff saw Mays due to a sick call he placed on November 5, 2019. (*Id.* at 159.) The notes from that visit show Mays reported an ingrown toenail on his "right great toe" and that he had hit that toe against the wall, resulting in blood and "different color puse [sic]" coming out of it. (*Id.*) As a result, during the November 7 visit, MEnD staff observed a "pea sized open area on the medial part," dried blood, and a small amount of bloody discharge. (*Id.* at 160.) The area was

slightly reddened but there was little to no swelling and no bruising.  (*Id.*)  Based on this

record, the Court assumes for purposes of summary judgment that Mays' ingrown toenail

constitutes a sufficiently serious medical need.

As to Mays' treatment for his ingrown toenail, on November 7, 2019, MEnD staff

recommended and ordered Epsom salt and band aids for Mays' right toe to be used for

fourteen days.  (*Id.* at 160, 164-65.)  Mays received a bucket for his foot soaks the

evening of November 9, 2019.  (*Id.* at 165.)  On November 17, 2019, Mays requested

medication for his right toe because he had not been able to perform the foot soak

treatment.  (*Id.* at 167.)  MEnD staff informed the Jail about Mays' complaint, informed

them that the foot soaks were to be performed twice daily, and instructed Mays to request

water from correctional officers.  (*Id.*)  On November 24, 2019, Mays reported that he

was only able to complete the foot soaks for three to four days "because he . . . did not

get the water."  (*Id.* at 169.)  As a result, MEnD staff ordered another round of Epsom salt

for Mays on November 24, 2019 and asked him to follow up as needed.  (*Id.*)

On November 26, 2019, Mays complained that he did not have access to a foot

basin to complete his foot soaks.  (*Id.* at 173.)  In response, MEnD staff informed Mays

that he was to receive a new bucket for his foot soaks, noting that he had refused the

bucket the first time it was offered, and that he should communicate with the correctional

officers for warm water.  (*Id.*)  On December 2, 2019 Mays requested to discontinue the

foot soak treatment on the basis that correctional officers had again "denied [him] access

to complete" it.  (*Id.* at 176.)  MEnD staff contacted a Jail officer on that same day, who

stated that Mays' "bucket ha[d] been being filled since Saturday. [Sergeant] reported that

[Mays] does have access to hot water, but he would need to use a cup to fill the bucket and [Mays] does not want to do this, so he asks the officers." (*Id.*) On December 2, 2019, MEnD staff documented that Mays "does in fact have access to the needed supplies for the [E]psom salt soaks." (*Id.*) Nothing in the record indicates that Mays complained about, or requested treatments for, his right toe after December 2, 2019, when he asked to stop the foot soak treatment.

In short, the uncontroverted evidence is that Mays received prompt treatment for his ingrown toenail and that MEnD staff worked with Jail staff to ensure he had the supplies he needed to treat it. While "the knowing failure to administer prescribed medicine can itself constitute deliberate indifference," *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795-96 (8th Cir. 2006), the record does not show such a "knowing failure." At worst, it shows an intermittent lack of communication between MEnD and Jail staff as to Mays' foot soak treatment, and also shows that at times Mays did not engage in foot soaks because he refused the basin or did not want to carry water. Moreover, Mays has not offered any evidence that the delay in foot soaks had any negative effect. *See Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) ("'An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'") (quoting *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d

1176, 1188 (11th Cir. 1994)).  The Court therefore recommends dismissal of Mays'

deliberate indifference claim based on his foot soaks.[14]

### ii.    Failure-to-Protect Claims

In Claim 2, Mays alleges that Defendant Joshua Kolar violated his First, Fifth,

Eighth, and Fourteenth Amendment rights by placing him in a substantial risk of serious

harm by stating in the presence of other inmates that Mays "needed to quit telling on

people," and that after Mays filed a grievance about that incident, Defendant Kolar made

statements "making [Mays] out to be an informant" in front of other inmates.  (Dkt. 1 at 6

¶ 2.)  Mays alleges that as a result of these statements, he was assaulted on July 31, 2019,

resulting in "a lot of physical & mental injuries."  (*Id.*)  In Claim 6, Mays alleges that

Defendants Rachael Clem and Hoppe violated his First, Fifth, Eighth, and Fourteenth

Amendment rights because on December 31, 2019, CO Clem "told a group of inmates

[Mays] had snitched on another inmate" and after reporting CO Clem's actions to

Sergeant Hoppe, CO Clem made a threatening statement to him, and that Mays had been

"harassed by a number of inmates and [he has] been dealing with lot's [sic] of mental &

emotional pain since that incident."  (*Id.* at 8 ¶ 6.)  In Claim 7, Mays alleges that

---

[14]    Mays alleges in his SJ Response that two months elapsed before he received "any
medical attention for his injuries."  (Dkt. 133 at 3.)  This argument appears to relate to his
tinted eyeglasses claim.  Mays, however, identifies no detrimental effect or harm
resulting from the delay, and the Court therefore recommends dismissal of any deliberate
indifference claim based on this delay under Rules 12(c) and 56.  *See Moots v. Lombardi*,
453 F.3d 1020, 1023 (8th Cir. 2006) (prisoner claiming deliberate indifference based on
delay in treatment must allege that the delay caused harm); *see also Crowley*, 109 F.3d at
502 (complaints of delay in medical treatment must be substantiated by medical evidence
to show that the delay had detrimental effect); *Lollie*, 2015 WL 3407931, at *6
(conclusory assertions are insufficient).

Defendants Heather Picket, Bartell, Mccdona, Hoppe, Lumply, Lizzy, Patton, Kolar, Ms. K., Rachael Clem, Zack, and Lori violated his Fifth, Eighth, and Fourteenth Amendment rights due to Defendants Kolar and Lizzy and "2 other unknown (CO[s])" placing him in a cell from December 27, 2019 through January 7, 2020 that was across from inmate J.B., who was known to have previously assaulted Mays, resulting in him suffering "[n]ightmares, [a]nxiety, [d]epression, [s]erve [sic] headaches & [e]tc." (*Id.* at 8 ¶ 7.)

As a pretrial detainee, Mays' failure-to-protect claim "is analyzed under the Fourteenth Amendment." *Brakeall v. Leidholt*, 4:16-CV-04057-KES, 2019 WL 4740183, at *10 (D.S.D. Sept. 27, 2019) (citing *Hartsfield v. Colburn*, 371 F.3d 454, 456-57 (8th Cir. 2004) (citing *Ervin v. Busby*, 992 F.2d 147, 150 (8th Cir. 1993) (per curiam) (finding that pretrial detainees' claims are evaluated under Due Process Clause rather than Eight Amendment))). "Although the Eighth Circuit has not ruled on the amount of protection afforded to pretrial detainees under the Fourteenth Amendment Due Process clause, pretrial detainees . . . have been afforded at least as much protection as under the Eighth Amendment." *Id.* (citing *Hartsfield*, 371 F.3d at 457). While the "Eighth Circuit has discussed the difference between the Eighth Amendment protection from cruel and unusual punishment and the Fourteenth Amendment protection from punishment to adjudication of guilt[,]" it "has consistently applied the deliberate indifference standard 'to pretrial detainee claims that prison officials unconstitutionally ignored a serious medical need or failed to protect the detainee from a serious risk of harm." *Id.* (citing *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006)).

50

"Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Holden v. Hirner*, 663 F.3d 336, 340-41 (8th Cir. 2011). "Due process protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted." *Wilkins v. Davis*, 963 F.2d 377 (8th Cir. 1992) (citations and quotations omitted). "To establish a failure to protect in violation of the federal constitution, a 'prisoner/detainee must prove both that the official's acts objectively caused a sufficiently serious deprivation and that the official had a subjective culpable state of mind.'" *Anthony Weston, Pl. v. Paul Coughlin, Def.*, Case No. 22-cv-1464 (WMW/LIB), 2022 WL 2959975, at *2 (D. Minn. June 8, 2022) (quoting *Perkins v. Grimes*, 161 F.3d 1127, 1130 (8th Cir. 1998)). "A pretrial detainee cannot maintain a failure to protect claim if he does not plausibly allege an injury that occurred or the risk of a future serious injury." *Id.* (citing *Hageman v. Morrison Cnty. Sheriff's Office*, No. 19-cv-3019 (JRT/HB), 2020 WL 3547218, at *3 (D. Minn. Apr. 22, 2020)).

As to Claim 2 against Defendant Joshua Kolar, the Complaint alleges that Mays wrote a kite/grievance while he was in segregation based on Defendant Kolar's statement made in the presence of other inmates that Mays "needed to quit telling on people" and that Defendant Kolar then made additional statements "making [Mays] out to be an informant" after Mays filed a grievance against him. (Dkt. 1 at 6 ¶ 2.) Mays alleges that as a result, an unnamed inmate assaulted him on July 31, 2019, resulting in physical and mental injuries. (*Id.*)

Defendants seek summary judgment on the grounds that Defendant Kolar denied making the statements, the reasons for the July 31, 2019 altercation are unclear, and Mays has not provided any specific facts or evidence supporting his conclusory allegations and failed to establish the required showing of harm.  (Dkt. 112 at 26.)  In their SJ Reply, Defendants argue "Claim 2 must be dismissed because Plaintiff failed to demonstrate he was involved in an altercation with another inmate because of any statements made by Officer Kholar, nor did Plaintiff show he suffered any harm."  (Dkt. 136 at 3.)

Mays did not address Claim 2 in his SJ Response.  As Defendants noted, Defendant Kolar has denied Mays' allegations.  (*See* Dkt. 115 ¶¶ 2-3 (Declaration of Joshua Kolar, stating he worked "in segregation while Mays was housed there at various times throughout his detention" and "[a]t no time did [he] make a comment or state something to the effect that Mays 'needed to quit telling on people' as alleged in his Complaint, nor did [he] make statements implying [Mays] was an informant").)

Notwithstanding the fact that Mays did not address Claim 2, the Court has reviewed the relevant record to determine if summary judgment is appropriate.  The record shows that Mays filed grievances against Defendant Kolar on March 23 and 24, 2019 for allegedly telling another inmate that Mays "kited out" of his housing unit; on July 24, 2019, Mays reported that he had been assaulted on July 16, 2019; on July 31, 2019, it was noted that Mays was involved that day in an altercation in the housing unit however, the cause of this altercation is not stated, and Mays was moved to the maximum segregation unit "due to being deemed a threat to the safety and security of the facility,

52

himself and/or others."[15]  (Dkt. 119-1 at 4, 6; Dkt. 119-4 at 14-15; Dkt. 119-5 at 118, 128-30.)  On August 16, 2019, Mays filed a grievance challenging the three reasons he was told he was in "max"—two of which were the July 16, 2019 altercation (which he described as an "alleged fight") and the July 31, 2019 altercation (which he also described as an "alleged fight").  (Dkt. 119-1 at 94.)  While Mays argued that he had already served his time for the first (July 16) fight and was never found in violation for the second (July 31) fight, he did not claim that the second (July 31) fight occurred because the other inmate believed he was a teller of tales or an informant, much less that the other inmate had any such belief due to any statements by Defendant Kolar.  (*See id.*)  Moreover, on August 5, 2019, Mays filed a grievance referencing the July 31 incident and admitting that the "2 issues with inmate[s]" were "**due to [Mays'] charges**."  (*Id.* at 80 (emphasis added).)

Notably, Mays did not claim around the time of the July 31, 2019 altercation that any statement by Defendant Kolar was responsible for the fights.  He made no argument as to Claim 2 in his SJ Response and submitted no evidence supporting his allegations. He has never identified the inmate or inmates that Defendant Kolar made the alleged statements in front of, nor did he show (or allege) that the inmate he fought with heard those statements or heard of those statements.  Indeed, Mays' own statements at the time of the incident indicate that the July 31, 2019 incident occurred because the other inmate

---

[15]    On February 4 and 5, 2020, Mays filed additional grievances against Defendant Kolar alleging that Defendant Kolar had retaliated against him for filing grievances, but he did not assert that Defendant Kolar had called him or suggested that he was an informant or teller of tales.  (Dkt. 119-1 at 340, 352.)

took issue with Mays' "charges." A "plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'" *Reed*, 561 F.3d at 790-91 (citations and internal quotation omitted). The Court recommends summary judgment in favor of Defendants on Claim 2 because Mays has not offered evidence from which a reasonable juror could infer that the July 31, 2019 altercation resulted from any statement of Defendant Kolar. *See Sims v. Brown*, 852 F. App'x 229, 230 (8th Cir. 2021) (affirming the district court's grant of summary judgment and finding that "Sims did not establish that defendants were deliberately indifferent in failing to protect her from assault by a fellow pretrial detainee, or in providing her medical care after the assault").

Moreover, notwithstanding his allegations of "a lot of physical & mental injuries," immediately after the incident, Mays said he was not hurt and did not need medical assistance. (Dkt. 119-4 at 14.) Medical records also indicate that Mays was not harmed by the July 31, 2019 altercation. (*See* Dkt. 119-5 at 128 ("Gait was normal and steady. Did not appear to be in any distress. No visible injuries to exposed areas of face or arms. Speech clear. Speaking in full sentences." and no "abnormal findings.").) The absence of any evidence of more than de minimis injury (or any injury) is another reason for granting summary judgment. *See King v. Dingle*, 702 F. Supp. 2d 1049, 1074 (D. Minn. 2010) (collecting cases) (Eighth Amendment context); *see also Schoelch v. Mitchell*, 625 F.3d 1041, 1046-47 (8th Cir. 2010) (holding that "[t]o establish a 'conditions-of-confinement' claim, including one based on an alleged failure to protect, [a pretrial

54

detainee] must show that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation" and granting summary judgment due to no evidence of "an objectively serious deprivation" where pretrial detainee was "grabbed" and slammed against the wall, the incident lasted "maybe a couple seconds," and the pretrial detainee "sought neither medical attention nor a transfer" after the incident) (cleaned up); *Hageman v. Morrison Cnty. Sheriff's Off.*, No. 19-CV-3019 (JRT/HB), 2020 WL 3547218, at *3 (D. Minn. Apr. 22, 2020) ("Since the Fourteenth Amendment affords 'at least as great of protection as that afforded convicted prisoners under the Eighth Amendment,' courts commonly use the corresponding Eighth Amendment standard to determine if there was a constitutional violation."), *R. & R. adopted*, No. 19-CV-3019 (JRT/HB), 2020 WL 3542752 (D. Minn. June 30, 2020).

As to Claim 6 against Defendants Rachel Clem and Hoppe, Mays alleges that on December 31, 2019, CO Clem "told a group of inmates [he] had snitched on another inmate" and after reporting CO Clem's actions to Sergeant Hoppe, CO Clem made a threatening statement to him, causing him to be harassed by several inmates and leading to him dealing with mental and emotional pain. (Dkt. 1 at 8 ¶ 6.)

The record shows Mays filed a grievance on December 31, 2019 stating that an inmate informed Mays that Defendant Clem had discussed complaints Mays made about that inmate with the inmate. (Dkt. 119-1 at 250.) Mays filed another grievance on January 2, 2020 against Defendant Clem claiming that she informed another inmate that Mays was a snitch. (*Id.* at 248-249). On January 5, 2020, Jail staff responded to the December 31, 2019 grievance as follows: "This is all hearsay. I spoke with [Defendant

Clem] and she did not say anything to the inmate.  If [the inmate] told you this, you were

tricked."  (*Id.* at 251).  Defendant Clem has denied making such statements.  (*See* Dkt.

113 ¶¶ 2, 3 (Declaration of Rachael Clem, stating "I did not tell a group of inmates Mr.

Mays snitched on another inmate.  I also did not make any comments in the tunnel about

Mr. Mays having to 'answer for what he did when he gets to prison'" and "On or about

December 31, 2019, Mr. Mays filed a grievance alleging something to the effect that I

informed Inmate [J.B.] that Mr. Mays had told on him for throwing urine on his door.  I

spoke with Officer Aric Hanson about this and informed him this was not true.").)  Mays

did not make any argument about this claim in his SJ Response or offer any evidence to

support it.  (*See* Dkt. 133.)  Further, while he alleges harassment by other inmates and

"lot's [sic] of mental and emotional pain" in the Complaint (Dkt. 1 at 8 ¶ 6), there is no

evidence of such in the record.  In view of the absence of any evidence of harm, and

based on Mays' failure to make any argument as to Claim 6, the Court recommends

dismissal of this claim as to Defendant Clem.

As to Defendant Hoppe, Mays does not specify what action (or inaction)

Defendant Hoppe took that resulted in him being harassed.  Indeed, the Eighth Circuit has

found that "[a] prison official, such as [Sergeant Hoppe], 'may not be held liable under

§ 1983 for the constitutional violations of a subordinate on a respondeat superior theory."

*Lenz*, 490 F.3d at 995 (citing *Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007).

Again, Mays does not address this claim or offer any evidence relating to it in his SJ

Response.  The Court concludes that there is no genuine issue of material fact as to Claim

6 with respect to Defendant Hoppe, and recommends the Court grant summary judgment as to that claim.

In Claim 7, Mays also alleges a failure-to-protect claim as to Defendants Heather Picket, Bartell, Mccdona, Hoppe, Lumply, Lizzy, Patton, Kolar, Ms. K., Rachael Clem, Zack, and Lori, namely that they failed to protect him against inmate J.B because Defendants Kolar and Lizzy placed him in a cell that was across from inmate J.B's cell and that all Defendants "knew or should have known [he] was being sexually harass[ed] & threaten[ed]" by inmate J.B. (Dkt. 1 at 8-9 ¶ 7.)

Defendants seek dismissal under Rule 12(c) as to the Defendants named in Claim 7 except for Defendants Kolar and Lizzy because "Only two of the officers, Officer Kholar and Officer Lizzy, are alleged to have moved Plaintiff to this new cell, but Plaintiff fails to elaborate any further on their involvement or knowledge." (Dkt. 112 at 34.) Defendants further contend: "Where a complaint alleges no specific act or conduct on the part of the defendant and the complaint is silent as to the defendant except for the name appearing in the caption, the complaint is properly dismissed, even under the liberal construction to be given *pro se* complaints." (*Id.*) The Court agrees, and recommends dismissal under Rule 12(c) as to all of the Defendants named in Claim 7 except for Defendants Kolar and Lizzy on this ground.

Moreover, the record does not show that Defendants Kolar and Lizzy, or any other Defendant, knew that inmate J.B. presented a risk to Mays or failed to act or respond to Mays' concerns. Mays' allegations span the period from December 27, 2019 to January 7, 2020. (Dkt. 1 at 8 ¶ 7.) The record shows that on December 31, 2019, Mays filed a

grievance referencing an assault on him by inmate J.B. that blamed a CO other than

Defendants Kolar and Lizzy for the assault[16], and acknowledged that "[he] was moved"

and that on January 14, 2020, upon receiving a grievance by Mays on January 5, 2020

regarding inmate J.B.'s threats of sexual assault against him, Jail staff responded, noting

that Mays and inmate J.B. "were not even housed in the same cell block." (Dkt. 119-1 at

250, 254-55.) On January 25, 2020, Mays filed a kite, asking Sergeant "McDonnah"

whether he heard threats and sexual comments that inmate J.B. made to Mays on either

January 5, 6, or 7, and on January 27, 2020, Sergeant "McDonnah" responded that he

"did not recall any threats or sexual comments" but that he remembered "some yelling

which [inmate J.B.] stopped when [he] asked him to." (Dkt. 119-2 at 121.) Mays

contacted the National ICE Sexual Assault hotline regarding the alleged harassment by

inmate J.B., which he claimed was witnessed by Sergeant "McDonough," CO Paul, and

another inmate that filed a grievance about the alleged harassment, and upon being

notified of this on February 4, 2020, on February 5, 2020, a Jail staff member entered a

report, stating that he spoke with "[Sergeant] McDonough who stated he specifically

remembers that day and did not hear any comments as Otis claims" but recalled "several

loud, disrespectful comments made that day from several inmates in those two cell

blocks. . . . but did not hear any sexual harassment from [inmate J.B.] to Otis." (Dkt.

119-4 at 41.) That report also notes that the other inmate who Mays claims witnessed the

incident had been released, but that the inmate had filed a grievance which "details

---

[16]     Claim 7 is not based on this December 31, 2019 assault. (*See* Dkt. 1 at 8 ¶ 7.)

comments [inmate J.B.] made to the female CO working that day" and "does not say what [inmate J.B.] says to Otis, only that [inmate J.B.] is verbally abusive to all inmates and staff in Special Housing." (*Id.*) The report further notes that CO Paul stated that "these two inmates and others in those two blocks would yell nonsense back and forth but never as Otis describes" and that "a no contact" was placed between Mays and inmate J.B. on January 5, 2020. (*Id.*)

Mays did not address his claim with respect to inmate J.B. in his SJ Response. Based on the record before the Court, the evidence is that Jail staff investigated Mays' grievances asserting that inmate J.B. was harassing him, and concluded that it did not constitute a threat (physical or mental) to Mays, but nonetheless instituted a "no contact order" as of January 5, 2020—the same day Mays filed his first grievance stating that inmate J.B. was threatening Mays with sexual violence. (*See* Dkt. 119-1 at 254 (January 5, 2020 grievance stating inmate J.B. was heard "vocally threaten[ing] [Mays] with sexual violence"); Dkt. 119-4 at 41 ("no contact order" as of January 5, 2020).) The Court concludes that summary judgment is appropriate as to this claim because, at a minimum, Mays has identified no evidence indicating any Defendant was deliberately indifferent to any risk posed by inmate J.B.'s threats to Mays.

In sum, the Court recommends granting the Motion for Summary Judgment as to Mays' failure-to-protect claims of Claims 2, 6, and 7.

### iii.    Claims for Retaliation and Failure to Intervene

Also in Claim 2, Mays suggests that Defendant Kolar retaliated against him because he filed a grievance/kite against Defendant Kolar based on comments he made.

59

(Dkt. 1 at 6 ¶ 2.)  In Claim 4, Mays also alleges that Defendant Jess retaliated against him for writing a grievance against her on January 22, 2020 and that Defendants Adrian Johnson, Kolbinger, and Paul were present while Defendant Jess took the retaliatory actions but failed to intervene.  (*Id.* at 7 ¶ 4.)  Mays appears to argue that Defendants Adrian Johnson, Kolbinger, and Paul retaliated against him based on the January 22, 2020 grievance he filed against Defendant Jess.  (*Id.*)

"A plaintiff bringing a First Amendment retaliation claim under § 1983 may show that officers violated his constitutional rights if '(1) he engaged in a protected activity, (2) [officers] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'"  *Waters v. Madson*, 921 F.3d 725, 741 (8th Cir. 2019) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).  An inmate's First Amendment rights, as well as other constitutional rights, may be limited if the regulation is reasonably related to legitimate penological interests.  *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Wolf v. McDonnell*, 418 U.S. 539 (1974) (constitutional rights of inmates may be limited by legitimate institutional concerns).  A correctional facility's need to control and discipline inmates in a prison setting is an accepted institutional concern whereby constitutional rights may be limited.  *See generally Wolf*, 418 U.S. at 557, 563-67.  Further, to overcome a defense of qualified immunity in a retaliation claim, Plaintiff "may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."  *Crawford-El v.*

*Britton*, 523 U.S. 574, 600 (1998); *see Technical Ordinance, Inc. v. United States*, 244 F.3d 641, 652 (8th Cir. 2001).

It is unclear whether Mays asserts a retaliation claim against Defendant Kolar in Claim 2. To the extent he is doing so, the alleged protected activity identified by Mays would be the filing of grievances that allegedly resulted in Defendant Kolar saying in front of inmates that Mays was an informant and told on people. (*See* Dkt. 1 at 6 ¶ 2.) However, Mays does not address this claim in his SJ Response, nor does he identify the grievances that prompted the alleged retaliation in the Complaint or elsewhere. Even if the Court assumed Defendant Kolar made the statements at issue (which he has denied), there is no evidence that they were causally linked to any of Mays' grievances, and Mays has not met his burden on summary judgment as to this claim. *See De Rossitte v. Correct Care Sols. LLC.*, 22 F.4th 796, 804 (8th Cir. 2022) (affirming the district court's grant of summary judgment in favor of defendants on plaintiff's retaliation claim because: "[The plaintiff] does not establish retaliatory motive. He must show the protected activity was a but-for-cause of the adverse action, meaning that the adverse action against the plaintiff would not have been taken absent a retaliatory motive. . . [The plaintiff] cites no evidence, either direct or indirect, linking any adverse action to the filing of his prison grievances. His mere allegations of retaliatory motive are insufficient.") (citations and quotations omitted); *see also Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019) ("We also agree the district court properly granted summary judgment on Bitzan's retaliation claims against VanWye, Nelson, Eaves, Dahm, and Bartruff, because Bitzan did not allege any facts connecting those defendants to the challenged actions.").

The Court therefore recommends granting summary judgment and dismissing any retaliation claim in Claim 2.

Mays asserts in Claim 4 that Defendant Jess threatened him with retaliation due to the January 22, 2020 grievance he filed against her and that Defendants Adrian Johnson, Kolbinger, and Paul retaliated against him because they were present but failed to do anything.  (Dkt. 1 at 7 ¶ 4.)  In particular, he alleges:

> On approximately 1-22-20 I wrote a grievance on (CO) Jess and turned it into (CO) johnson minutes later she was yelling at me for that grievance & threatening me with retaliation[]. While the threats of retaliation were happening (CO) Johnson, (CO) Paul & (SGT) Kholbanger where all present but none of them did anything they just set there & watched. which allowed (CO) Jess to continue on threatening me with retaliation for filling a grievance. Later that day (CO) Jess wrote me up & I was disciplined.

(*Id.*)

As an initial matter, Mays' failure-to-intervene claims against Defendants Adrian Johnson, Kolbinger, and Paul fail because there is no duty to intervene outside of the excessive force context.  *See Sampson v. Lambert*, 903 F.3d 798, 801 (8th Cir. 2018); *see also Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012) (finding that the Eighth Circuit had "not recognized a duty to intervene to prevent other constitutional violations [other than in the excessive force context].") (citing cases); *Halverson v. Schneider*, Civ. No. 15-4297 (WMW/DTS), 2018 WL 3422075, at *4 (D. Minn. April 25, 2018) ("Because Halverson has not alleged excessive force, his failure to intervene claim fails.").

As to Mays' retaliation claim against Defendant Jess, his January 24, 2022 grievance complaining about Defendant Jess admits that his January 22, 2020 grievance (Number 106720) did not identify Defendant Jess by name, although he claimed she

knew it was about her. (Dkt. 119-1 at 305.) Mays filed at least eight grievances on January 22, 2020, including about the removal of his grievance response forms from his cell, seeking the Jail's PREA policy, about his inability to get the phone to work when trying to "file" a PREA complaint, about his phone being disconnected when speaking with his attorney, claiming that his grievances were not being addressed, about the fact that a CO (not Defendant Jess) said he filed too many grievances, and about the denial of certain visits (based on a "no contact order"). (*Id.* at 278-93, 296-97.) The grievance at issue complained about a CO disconnecting Mays' phone when speaking with his lawyer, which the CO said was because the CO did not see Mays and it was "time to lock in" where Mays disputed that he was not seen), and alleged the disconnection was retaliation for an unspecified reason.[17] (*Id.* at 286.) In another grievance filed on January 24, 2020, Mays admitted that he did "lock in late" but asserted that another inmate who had done the same was not written up. (*Id.* at 307.) He also claimed that he had not known Defendant Jess had written him up until another CO told him, and that he "feel [sic] like CO Jess now has a target on me." (*Id.*) Defendant Jess denied retaliating against Mays. (Dkt. 114 ¶¶ 2-4; *see also* Dkt. 116 ¶ 6 (Kolbinger saying he had never seen Defendant Jess yell at Mays or threaten him with retaliation).) Mays did not address this claim or identify any evidence supporting it in his SJ Response. The record indicates that Defendant Jess wrote Mays up for locking in late, which Mays admitted. There is no evidence that the grievance was based on a retaliatory motive (rather than Mays'

---

[17]    The next day, Defendant Hoppe responded "When lockdown is called, regardless of who you are talking to you need to lock in." (Dkt. 119-1 at 288.)

admitted late locking in), only Mays' conclusory assertions and feelings, which are insufficient to preclude summary judgment. *See Larson v. Lake*, Case No. 17-cv-3551 (NEB/ECW), 2019 WL 5150832, at *8-9 (D. Minn. June 10, 2019) (recommending summary judgment in favor of defendants because plaintiff "Greene [failed to identify] any evidence supporting his allegation that he was moved to or kept in the new block for retaliatory reasons [for appealing an incident]. Wilmes' report indicates that Greene was moved to a different block during the incident because other inmates were becoming agitated by Greene's disrespectful behavior. . . . The evidence in the record supports that Greene was moved to Block 5 and kept there due to his behavior during the May 19, 2017 incident (as opposed to for a retaliatory reason.)"). The Court therefore recommends that Defendants' Motion for Summary Judgment be granted as to these claims.

### iv.    Mays' Conditions of Confinement Claim

According to Mays, the Jail, along with Defendants Pat Carr, Thomas Zerwas, Lunstrom, Lisa, Bartell, Bond, McDonnah, Zack, Sherry K, Patton, Lumply, Lori, Drew Howt, Sean, Paul, Tom Bergron, Rachael Clem, Kolar Joshua, Ashley G, and Simon subjected him to "cruel & inhumane conditions of confinement related to the unnecessary exposure & health risk" because he was "forced to eat[,] sleep & live in a cell for more than 50 plus hours with a toilet that was filled with another inmates [sic] human waste" and made several requests to the Defendants to allow him "to eat outside of [his] cell, to be moved to another cell to relieve [himself] & to have [his] toilet repaired as soon as

possible" but to no avail, leading him to contracting "a rash on [his] butt as well as hemorrhoids." (Dkt. 1 at 6-7 ¶ 3.)

As a pretrial detainee, Claim 3 is analyzed under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment. *See Owens*, 328 F.3d at 1027 (citation omitted). "Under the Fourteenth Amendment, pretrial detainees are entitled to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "The Constitution affords greater protection to a pretrial detainee compared to a convicted inmate in a sense that due process requires that a pretrial detainee not be punished." *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (cleaned up) (quotation and citation omitted). The court applies "the Eighth Amendment 'deliberate indifference' standard" "when pretrial detention is unconstitutionally punitive." *Owens*, 328 F.3d at 1027 (citations omitted). And "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Id.* (citing *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)). "The Eighth Circuit Court of Appeals has described the length of time an individual was subjected to the harsh confinement to be a crucial factor. Conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." *Brenizer v. Cnty. of Sherburne*, Case No. 21-cv-1301 (DSD/TNL), 2022 WL 1110203, at *12 (D. Minn. Feb. 1, 2022) (citing *Howard*, 887 F.3d at 137 (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)); *Owens*, 328 F.3d at 1027; *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996); *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 957-58 (8th Cir. 1994)) (internal

quotations omitted). "At the same time, 'while the length of time a prisoner must endure an unsanitary cell is undoubtedly one factor in the constitutional calculus, the degree of filth is surely another" and "the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases." *Id.* (citing *Whitnack*, 16 F.3d at 958) (cleaned up). The Eighth Circuit has "noted the need to be 'especially cautious about condoning conditions that include an inmate's proximity to human waste.'" *Owens*, 328 F.3d at 1027 (citing *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990)). "In considering whether the conditions of pretrial detention are unconstitutionally punitive, [the Court] review[s] the totality of the circumstances of a pretrial detainee's confinement." *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010) (citing *Owens*, 328 F.3d at 1027).

The record shows that Mays complained that his toilet was broken and that it was collecting his neighbor's feces on January 6, 2020. (Dkt. 119-1 at 258, 260, 262.) On January 10, 2020, a Jail staff member reported Mays' "toilet ha[d] been repaired and [that Mays] ha[d] moved on to Gamma Housing Unit." (*Id.* at 259.) Mays filed another grievance on January 24, 2020 which is somewhat unclear, but appears to complain that he was told to stop writing so many grievances "[i]nstead of getting someone down there to fix [his] toilet." (*Id.* at 313.) Based on the response, it appears that Mays' toilet was not broken again, but he was complaining about statements made when it was broken. (*Id.* at 314 ("This issue is has [sic] been resolved and you have appealed it as well. You are not allowed to abuse the grievance process with endless frivolous grievances that can be answered with simply talking to a staff or Sergeant, who is in your pod daily. You see

66

when you write 165 grievances in less than 10 months, that is not appropriate, that is abusing the grievance process especially when you write multiple grievances on the same very topic. Stop abusing the process[.]").) In an appeal filed on January 27, 2020, Mays stated that he agreed with Sergeant "Bjergo's response and [was] truly grateful that he took action and got the issue fixed the night [he] talked to him," but asked why it took "more than 50 plus hours" to fix the toilet. (*Id.* at 323.) A Jail employee reported on January 29, 2020 that Mays' toilet had been fixed the day after he mentioned the issue to Sergeant Bjergo and informed Mays that writing "a grievance [was] not the quickest way to alert anybody that [his] toilet [was] broken. Talking with staff is." (*Id.* at 325.) On January 24, 2020, Mays reported to MEnD staff that he was unable to use the bathroom for 3-4 days due to his broken bathroom, and he complained of a rash, but refused to let staff assess it and acknowledged that the clinic was unable to prescribe him any medications without assessing his skin. (Dkt. 119-5 at 193, 197, 216-17.)

The totality of the circumstances does not show that Mays' temporary exposure to an unsanitary condition violated his constitutional rights. *See Smith*, 87 F.3d at 268 ("[A]ny analysis of confinement conditions must be based on the totality of circumstances."). To the contrary, the record shows Jail staff responded to Mays' requests and that the toilet was fixed within a few days. *See id.* at 268-69 (finding no constitutional violation where a pretrial detainee was subjected to an overflowed toilet for four days).

While Mays alleges that he caught a rash and hemorrhoids due to not being able to use the bathroom, he has not presented any evidence indicating that either was due to his

overflowing toilet.  The record shows that on March 28, 2019, he informed MEnD staff that he had a history of constipation and on February 28, 2020, he noted that he had a history of hemorrhoids.  (Dkt. 119-5 at 27, 203.)  Additionally, although, Mays complained of a rash beginning in late January 2020, he refused to allow medical staff assess it.  (Dkt. 119-5 at 193, 197 ("Pt reported he has been noticing an [sic] sticky irritation on the top of his butt crack, denying an odor.  Writer requested to assess; pt stated he would not let writer assess, but was itchy and irritating.  Writer talked to pt about hygiene, and drying completely after showers, educating on fungal infections."); *id.* at 203-04 ("Patient stated that he has a history of hemorrhoids and that he was given stool softeners the last time.  Patient stated that he thinks it is starting again. . . .  Patient stated that his anus does itch but it is not worsening.") (prescribed hemorrhoid ointment); *id.* at 216 ("Reports he also has a rash still.  States he felt it when he wiped. . . .  States he took the cream he was prescribed, but doesn't feel like it went away. . . .  Patient states he is too uncomfortable to allow writer or any other female staff to observe his rectum/ buttocks.  Writer explained that the clinic cannot prescribe him any medications, without assessing his skin.  Patient stated he understood and that he will wait to see if the colace helps any of his other issues.").)

Based on the record, no reasonable trier of fact could infer that Mays' exposure to an overflowing toilet for approximately 50 hours resulted in a rash near his anus or his hemorrhoids.  The Court therefore recommends that Defendants' Motion for Summary Judgment be granted as to this claim.  *See Goldman v. Forbus*, 17 F. App'x, 487, 488-89 (8th Cir. 2001) (affirming the district court's judgment and finding that although the

plaintiff had spent two nights in a two-man cell with two other men, causing him to sleep on a mattress near the toilet so that urine was sprinkled on him when his cellmate used the toilet and although the plaintiff had also spent four nights in an eight-man cell with ten other men, causing him to sleep in a similar condition as previously experienced, the plaintiff's "stay in each cell was brief, he was allowed to leave the cells during the day, the record does not show that he suffered any physical harm from being housed in either cell, and when he complained about not having a bed, he was moved to a cell where he had one"); *see also Smith*, 87 F.3d at 269-69.

### v.    Allegations Against Defendants Lumply and Travis Lunstrom

Mays contends that Defendants Lumply and Travis Lunstrom violated his rights because Defendant Lumply "verbally made a sexual statement to [him] and threaten[ed him]" on January 21, 2020 while knowing that Mays had been "sexually abused" by "inmate J.B." the week before, and that he "believe[d]" Defendant Lumply made those statements because Mays had filed "a grievance a week before on his Sgt. for his part in [Mays'] sexual abuse." (Dkt. 1 ¶ 5.)

At a starting point, the Complaint is completely devoid of any actions (or inaction) that Defendant Travis Lunstrom took that created a substantial risk to Mays' mental health as alleged in Claim 5. Mays does not also provide the contents of Defendant Lumply's January 21, 2020 statement to him or what acts Defendant Lumply threatened him with. Based on the allegations in the Complaint, it is not clear what grievance Mays believes led to Defendant Lumply's conduct, who the sergeant referenced in the

grievance is, or what the content of that grievance was, or why Mays "believe[d]" the statement was due to his grievance.  As stated previously, conclusory assertions are insufficient.  *Lollie*, 2015 WL 3407931, at *6.

In his SJ Response, Mays argued a failure to discipline with respect to Defendant Lumply (Dkt. 133 at 1), but did not offer any evidence to support his claim of sexual harassment or that a grievance caused Defendant Lumply's alleged sexual statement. Moreover, the Eighth Circuit has specifically found that "[v]erbal threats and name calling usually are not actionable under § 1983."  *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (citations omitted).  Mays has not made any argument why this general rule should not apply here.  The Court therefore recommends dismissal of Claim 5 under Rules 12(c) and Rule 56.

### vi.    Mays' Due Process Claim Relating to His Jail Disciplinary Hearing

Mays alleges in the Complaint that "Defendant SGT. Unknown" violated his rights by not giving [him] a hearing by the wolf standards," given that his requests to be represented by a staff during a jail disciplinary proceeding due to an infraction that occurred on October 15, 2019 and to have two witnesses testify were not upheld.  (Dkt. 1 at 9-10 ¶ 9.)  Mays alleges that he was told his silence would be used against him if he did not answer certain questions and that the sergeant that conducted his hearing informed him that he spoke to the two witnesses Mays requested, but that Mays thereafter talked to the witnesses and they informed him the sergeant's statement was incorrect. (*Id.*)

Defendants argue that Mays failed to allege that any of these issues affected his hearing and therefore, failed to allege a harm, and that Mays failed to allege facts that demonstrate a constitutional violation.  (Dkt. 112 at 39.)  Defendants contend that Mays has not identified what liberty or property interests he was deprived of and that Mays' allegations that he was informed his silence would be used against him if he does not answer questions does not establish a cognizable claim.  (*Id.* at 40, 42-43.)  Mays did not respond to Defendants' arguments in his SJ Response.  (*See generally*, Dkt. 133.)

Pretrial detainees cannot be "punished" without due process.  *Dale v. Brott*, Civ. No. 12-383 (PJS/JSM), 2013 WL 12074952, at *11 (D. Minn. July 23, 2013) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)), *R. &R, adopted by* 2013 WL 12074953.  "A due process claim is cognizable only if there is a recognized liberty or property interest at stake."  *Beaulieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012) (citing *Ragan v. Lynch*, 113 F3d 875, 876 (8th Cir. 1997)).  In determining whether Mays has sufficiently alleged a procedural due process claim, "the Court conducts a two-part inquiry."  *Linehan v. Johnston*, Case No. 0:18-cv-03483-WMW-KMM, 2019 WL 6879366, at *3 (D. Minn. Nov. 26, 2019), *R&R adopted by* 2019 WL 6873984.  "First, the Court considers whether [Mays] has alleged sufficient facts to establish the existence of a protected liberty or property interest that has been interfered with by the government."  *Id.*  If his liberty or property interest is implicated, the Court next determines "whether [Mays] has alleged facts showing that the procedures use[d] to interfere with that interest were constitutionally insufficient."  *Id.* (citing *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006)).

71

Mays did not allege who conducted his hearing, when he received the notice of hearing, when the hearing occurred, who told him that his silence would be used against him and when he was told this, when the sergeant informed him that he interviewed the two witnesses, who the witnesses are, when he talked to the two witnesses, or what the result of the hearing was. Importantly, Mays did not allege which liberty or property interest he was deprived of as a result of the allegedly unconstitutional hearing. To the extent he is relying on his removal from a particular unit on the same night he was written up (October 15, 2019) and placement in administration segregation, the Court is unable to discern any such deprivation based on that allegation. *See Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002) ("We have consistently held that administrative and disciplinary segregation are not atypical and significant hardships.") (dismissing at prescreening); *see also Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship."); *Larson v. Jesson*, Civ. No. 11-2247 (PAM/LIB), 2018 WL 3352926, at *4-5 (D. Minn. July 9, 2018) (finding that "the placement in administrative segregation is not a constitutional deprivation actionable under § 1983"). The Court recommends dismissal of Claim 9 under Rule 12(c) both because Mays has not alleged a constitutional deprivation of liberty or property interest.

### vii.    Service

Defendants argue that while Mays has sued them in their official and individual capacities, none of them have been personally served as many of the summonses are addressed to only first names and have not been signed by any of the Defendants in

violation of Federal Rule of Civil Procedure 4(c)(1), and as a result, this Court lacks jurisdiction over them.  (Dkt. 112 at 6-8.)  Plaintiff did not address this issue in his SJ Response.

As stated above, Mays' Complaint included a "Defendants List Master," listing the Defendants as: "Zack," "Ms. Sherry K.," "Patton," "Lumply," "Lori," "Rachael Clem," "Kholar Joshua," "Andrea," "Jess," "Sean," "Ashley G," "Bryan Bjergo," "Brian McDonough," "Tyrel Hoppe," "Aric Hanson," "Bond," "Travis Lundstrom," "Heather Picket," "Demar," "Kolbinger," "Christopher Bloom," "Thomas Zerwas," "Brian Frank," "Dave Isais," "Pat Carr," "Mike Siege," "Janail Hassian," and the Jail.  (Dkt. 1. at 1, 5.) Because Mays' IFP Application was granted, in April 2020, the Clerk's Office sent Mays USM 285 service forms for each Defendant, with the names of the Defendants listed exactly as in the Complaint.  (Dkts. 12-14.)  Defendants' counsel filed an answer to the Complaint on June 2, 2020, listing the Defendants in the same way they were named in the Complaint, except for "Andrea" and "Janail Hassian," and "affirmatively allege[d] [that] Plaintiff failed to properly identify or to serve sufficient process on any Defendants."  (Dkt. 17 at 4 ¶ 17.)  After receiving discovery materials from Defendants, Mays asked the Court to "change the names of the defendants in the docket" (Dkt. 69 at 5-6) and unsuccessfully sought to amend the complaint at various times (*see e.g.*, Dkts. 30, 39, 48, 50, 69, 75, 79, 88).  Thus, the initial Complaint is the operative Complaint in this case.  (*See* Dkt. 39 at 5 ("The original Complaint **(ECF No. 1)** remains the operative pleading in this case."); Dkt. 88 at 5-6 (noting denials of leave to amend).)

"Public servants may be sued under section 1983 either in their official capacity, their individual capacity, or both." *Spencer v. Brott*, Case No. 17-cv-5035 (DSD/TNL), 2019 WL 6884775, at *4 (D. Minn. Nov. 21, 2019) (citations omitted). "The capacity in which the County employees have been sued dictate the type of defendant involved (an individual, the governmental employer, or both) and thus the method of service required." *Id.* (citing Fed. R. Civ. P. 4(e)-(j)). Pursuant to Rule 4(c)(1), "[a] summons must be served with a copy of the complaint. The plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m) and must furnish the necessary copies to the person who makes service." Fed. R. Civ. P. 4(c)(1). Where, as here, a plaintiff has been granted IFP status, the "officers of the court shall issue and serve all process," and "the court [must] order that service be made by a United States marshal or deputy marshal . . . ." 28 U.S.C.A § 1915(d); Fed. R. Civ. P. 4(c)(3). "If a defendant is not served within 90 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant . . . ." Fed. R. Civ. P. 4(c)(3).

"If a defendant is improperly served, a federal court lacks jurisdiction over the defendant." *Printed Media Servs., Inc. v. Solna Web, Inc.*, 11 F.3d 838, 843 (8th Cir. 1993) (citing *Dodco, Inc. v. Am. Bonding Co.*, 7 F.3d 1387 (8th Cir. 1993); *Sieg v. Karnes*, 693 F.2d 803, 807 (8th Cir. 1982)). The plaintiff has the burden of establishing whether service of process was proper. *See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir. 1995). "[A]ctual notice of the pending action is not sufficient if there has not been compliance with the

plain requirements of Rule 4." *Baden v. Craig-Hallum, Inc.*, 115 F.R.D. 582, 586 n.4 (D. Minn. 1987); *see also Adams v. AlliedSignal Gen. Aviation Avionics*, 74 F.3d 882, 885 (8th Cir. 1996) (citing *Printed Media Servs.*, 11 F.3d at 843) ("[I]f AlliedSignal, Inc., was improperly served, the district court lacked jurisdiction over that defendant whether or not it had actual notice of the lawsuit.").

Here, Defendants argue that service has not been effectuated on them in their individual capacities. (Dkt. 112 at 6-8.) While summonses were issued for each Defendant, the docket only reflects an executed summons by "Defendant Sherburne County Jail et al," at "Sherburne County Government Center, Attn. Auditor/Treasurer." (Dkt. 31.) Defendants argue that to the extent they were sued in their individual capacities, they should have been served at their residence, by service on an agent legally authorized to receive service, or pursuant to any method approved by state law. (Dkt. 112 at 6-7.) Defendants further note that many of the summonses were made out only to a first name and that the process receipt and return is not signed by any Defendant. (*Id.* at 6 (citing Dkt. 31).)

At this stage in the proceedings, Mays has been on notice that Defendants challenged service since they served their answer in June 2020. He has never attempted to perfect service on the Defendants in their individual capacities, nor did he argue that service was effectuated or that he should be given more time to effectuate service under Rule 4(m), which provides that "if the plaintiff shows good cause for the failure [to serve], the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). The Court recommends dismissal of Mays' claims against Defendants in their

individual capacities for failure to serve within the time required and failure to show good cause for any extension. *See Flowers*, 2011 WL 2412906, at *5 (recommending dismissal for failure to serve where U.S. Marshals Service was unsuccessful in serving a defendant and because the plaintiff failed to make any subsequent effort to obtain service, show good cause, or seek additional time); *Baez v. Connelly,* 478 F. App'x 674, 675-76 (1st Cir. 2012) (affirming district court's refusal to extend the time for service for two defendants given that the plaintiff failed to provide their first names and misspelled their last names).

### d.    State Law Negligence Claims

The Court turns to the state law negligence claims asserted in the Complaint. Pursuant to 28 U.S.C. § 1367, where a federal court has original jurisdiction, it also has supplemental jurisdiction over "all other claims so related to the claims in the original jurisdiction that they form part of the same case or controversy." *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000). However, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Porter v. Williams*, 436 F.3d 917, 920 (8th Cir. 2006) (holding that a trial court may sua sponte decline supplemental jurisdiction based on § 1367(c)(3)).

The Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims."

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 678 (8th Cir. 2012). The Eighth Circuit has "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible." *Gregoire*, 236 F.3d at 420 (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990)).

Here, these principles counsel that the Court should decline to exercise supplemental jurisdiction over Mays' state law negligence claims and that those claims should be dismissed without prejudice. *See Spottswood v. Washington Cnty., Minnesota*, No. 19-CV-1331 (MJD/ECW), 2022 WL 707202, at *13 (D. Minn. Jan. 20, 2022), *R. & R. adopted sub nom.*, 2022 WL 706846 (D. Minn. Mar. 9, 2022)

### e.    Qualified Immunity

Defendants assert they are entitled to qualified immunity. (Dkt. 112 at 19, 30-33.) The Supreme Court has laid out qualified immunity's parameters as follows:

> Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the

plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." This requires a high "degree of specificity." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal citations omitted). A government

official is entitled to qualified immunity **unless "both of these questions are answered**

**affirmatively**." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (cleaned up)

(emphasis added).

Because the Court recommends granting the Motion for Summary Judgment in its

entirety, the Court need not inquire further into qualified immunity. *See Wever v. Lincoln*

*County, Nebraska*, 388 F.3d 606, 605 (8th Cir. 2004) (stating that in making a qualified

immunity analysis: "[W]e must perform two inquiries in proper sequence. First, we must

ask whether, when viewed in the light most favorable to the plaintiff, the alleged facts

show the official's conduct violates a constitutional right. If the answer to this question is

'yes,' then we ask a second question.") (quotations and citations omitted); *see also Mayer*

*v. Walvatne*, No. 07-1958 (JRT/RLE), 2008 WL 4527774, at *12 n.5 (D. Minn. Sept. 28,

2008) (recommending that defendant's summary judgment motion be granted and finding

"Since we conclude that Walvatne committed no violation of Mayer's constitutional

rights, as to her claims arising from her arrest, we have no occasion to address the

question of his qualified immunity. . . .  As a consequence, our analysis of the applicability of qualified immunity to the conduct of Walvatne proceeds no further.").

## B.    Requests to Preserve Recordings and Motion for Hearing

The Court turns to Mays' Requests to Preserve Recordings and Motion for Hearing.  First, because the Court recommends dismissal of this action, the Court recommends denial of the Requests and Motion as moot.[18]  *Njaka v. Kennedy*, Civ. No. 12-2712 (JRT/JJG), 2014 WL 4954679, at *18 (D. Minn. Sept. 30, 2014) ("[I]n light of the Court's determination as to dismissals, the [request to preserve recordings and motion for hearing] should be denied as moot.").

Second, the Court would recommend denial of Mays' Requests to Preserve Recordings and Motion for Hearing in any event.  With respect to the Requests to Preserve Recordings, as stated by Defendants, the vast majority of videos Mays seeks to preserve are recordings from events that occurred after this case was filed on February 13, 2020 (*see generally*, Dkts. 134, 138), and Mays has not satisfactorily explained how that footage is relevant to this action.  Moreover, the fall 2021 discovery deadlines set in Judge Menendez's August 6, 2021 Order (Dkt. 88) passed long before Mays filed the Requests and Mays did not file a motion to modify the Scheduling Order to permit additional discovery.  In fact, the Court previously amended the Scheduling Order to accommodate Mays' discovery requests (*see* Dkt. 88) and on January 25, 2022, the Court

---

[18]    The Requests are non-dispositive, *see* D. Minn. LR 7.1(b)(4)(iii), and as such, the Court would normally decide them by Order.  Due to their relationship with Defendants' Motion for Summary Judgment, the Court makes a recommendation instead.

stated that, to the extent Mays sought a modification of the Scheduling Order, he must file the appropriate motion by February 25, 2022 (Dkt. 131). Mays failed to meet that deadline, instead choosing to request other relief on February 3, 2022; February 17, 2022; and February 18, 2022. (Dkts. 134, 137, 138.) Local Rule 16.3 requires a party seeking modification of the Scheduling Order to file a motion and to: "(1) establish good cause for the proposed modification; and (2) explain the proposed modification's effect on any deadlines." D. Minn. L.R. 16.3(a)(b); *see also* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). The Requests filed by Mays do not meet these requirements, and the Court declines to treat those Requests as motions to amend the Scheduling Order to extend the discovery deadline.

Even if the Court did treat the Requests to Preserve Evidence as motions to amend the Scheduling Order, the Court finds unpersuasive Mays' arguments that good cause exists due to his "more than 7" transfers from one jail to another, because those transfers resulted in lost documents and a lost USB drive, and because he had to quarantine for each transfer. (*See* Dkt. 150 at 1-2.) Mays sent multiple letters to the Court and filed several motions during the period between the August 6, 2021 Order setting a November 3, 2021 deadline for nondispositive motions and that November 3, 2021 deadline. (*E.g.*, Dkts. 89, 90, 92, 94, 97, 100, 104.) In response to his September 7, 2021 letter complaining about his transfers to (at that time) "four different facilities," stating he just received the August 6, 2021 Order, and asserting that Defendants had destroyed or lost his evidence (Dkt. 89), Judge Menendez ordered Defendants to "copy their entire document production to a flash drive or thumb drive and send the same to Mr. Mays

within seven days of [that] Order" (Dkt. 91). Defendants did so on September 22, 2021.
(Dkt. 93.) On September 24, 2021, Judge Menendez rejected Mays' arguments in his
September 22, 2021 letter asking her to revisit the August 6, 2021 denial of his discovery
requests. (Dkt. 96 (discussing Dkt. 92).) The Court agrees with Judge Menendez's
previous assessment of whether Mays needed additional time for discovery, and further
finds that her September 2021 Orders remedied any issues attributable to his transfers and
lost evidence.

To the extent Mays relies on his prescription for rose-tinted glasses issued by
"Institutional Eye Care" on January 23, 2022 as good cause (Dkt. 150 at 2; *see* Dkt. 137
at 1), as discussed below, Mays has not named the proper defendant for the current denial
of such glasses (rather than the denial based on the earlier "recommendation"). In sum,
the Court recommends denial of the Requests as untimely and because Mays has not
shown good cause to amend the Scheduling Order to permit any additional discovery.
*See Foster v. Litman*, Case No. 19-cv-0260 (JNE/ECW), 2020 WL 4548281, at *2-4 (D.
Minn. Aug. 6, 2020).

Similarly, Mays alleges in the Motion for Hearing that he has been denied access
to medical care at the Jail since September 2021. (Dkt. 137 at 1.) Mays previously
presented his lack of access to health care issue in a prior motion for emergency hearing
that he filed on November 3, 2021. (*See* Dkt. 104.) On December 3, 2021, Judge
Menendez denied Mays' request, noting that:

> None of Mr. Mays's claims in this litigation concern the issues he has raised
> in his motion for an emergency hearing. In this case, Mr. Mays is seeking
> relief related to conditions of his confinement at Sherburne County Jail

before February of 2020. In other words, the conduct of Sherburne County
Jail officials about which Mr. Mays complains in this motion—allegedly
inadequate medical care since September 3, 2021—is unrelated to the
conduct that he complains of in his operative pleading. As a result, to the
extent Mr. Mays seeks injunctive relief relating to his current medical care,
this case is not the proper avenue in which to receive it. The Court has
previously explained to Mr. Mays that he cannot obtain injunctive relief in
this litigation for conduct that is unrelated to the allegations in the operative
pleading. [ECF No. 99 at 8–9].

To the extent Mr. Mays is asking the Court to allow him to amend or
supplement the complaint to add allegations to this case about these recent
events, that request is denied. The deadline for Mr. Mays to amend his
complaint in this action was more than a year ago—October 19, 2020.
Though he certainly could not have raised these new allegations at that time,
adding them to this case now would cause undue delay in resolving the issues
properly before the Court and would be unfairly prejudicial to the Defendants
who have an interest in resolving this litigation in a timely fashion.

None of this is intended to minimize Mr. Mays's claims that he is not
receiving proper medical attention. There are other avenues than this
litigation in which he may pursue relief related to his allegations regarding
these recent events. However, Mr. Mays's request for an emergency hearing
is denied.

(Dkt. 109 at 2-3.)

To the extent the Motion for Hearing is based on medical issues that are unrelated
to the issues raised in his Complaint, the Court recommends denial for the reasons stated
in Judge Menendez's December 3, 2021 Order.  To the extent Mays raises concerns about
tinted eyeglasses and a January 23, 2022 prescription from Institutional Eye Care (Dkt.
137 at 1; Dkt. 137-1 at 4), as stated in Section III.A.2.c.i above, the Eighth Circuit has
found that "nothing in the Eighth Amendment prevents prison doctors from exercising
their independent medical judgment.  Prisoners do not have a constitutional right to any
particular type of treatment" and "Prison officials do not violate the Eighth Amendment

when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Long*, 86 F.3d at 765. Moreover, it appears that it is the U.S. Marshals Service, which is not a party to this litigation, that is denying Mays the rose-tinted eyeglasses (Dkt. 137 at 1 ("But he has been denied by the USM that he can not be issued glasses due to the fact he has not been in the Sherburne County Jail for more than a year.").) The U.S. Marshals Service is not a party to this litigation. To the extent Mays attempts to impute the U.S. Marshals Service and medical staff's actions to Defendants, the Court finds that argument unpersuasive and denies it for the reasons stated in Section III.A.2.c.i above. The Court also denies Mays' requests for discovery and to modify the Scheduling Order. *See* D. Minn. L.R. 16.3(a)(b); *see also* Fed. R. Civ. P. 16(b)(4). As such, the Court recommends denial of Mays' Motion for Hearing.

## IV.    RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.    Defendants' Motion for Summary Judgment and Judgment on the Pleadings (Dkt. 110) be **GRANTED**;

2.    Plaintiff Otis Mays' Request to Preserve Jail Recordings, Video Footage & or Turn Over the Requested Video Footage (Dkt. 134) be **DENIED**;

3.    Plaintiff Otis Mays' Motion for Hearing on Lack of Medical Care in Marshals Custody (Dkt. 137) be **DENIED**;

4.    Plaintiff Otis Mays' Request to Preserve Jail Recordings, Video Footage & Turn Over the Requested Video Footage (Dkt. 138) be **DENIED**; and

5.      This case be **DISMISSED WITH PREJUDICE** as to all Defendants,

except for Plaintiff's state law negligence claims, which should be **DISMISSED**

**WITHOUT PREJUDICE**.

Dated: July 29, 2022                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge

### NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).